George Welch -- May 24, 2021

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MISSISSIPPI

OXFORD DIVISION


GEORGE WELCH                                    PLAINTIFF

V.               CIVIL ACTION NO. 3:20-CV-00122-NBB-JMV

CITY OF HERNANDO, MISSISSIPPI, ET AL           DEFENDANTS



DEPOSITION OF GEORGE WELCH

    Taken on Monday, May 24, 2021, at 9:33 a.m., in the

offices of Perry Griffin, PC, 5699 Getwell Road,

Suite G-5, Southaven, Mississippi 38672, at the instance

of the Defendants



Appearances Noted Herein



Reported by:

    Karen C. Popernik, MS CCR 1276, TN LCR 469

REPORTING BY DANA, LLC
Post Office Box 1362
Brandon, Mississippi 39043
(601)-506-3440
DanaDMoulder@gmail.com

EXHIBIT "A"

George Welch -- May 24, 2021

1    people that you would be related to in this area?

2         A.  No.

3         Q.  Okay.  No sisters, brothers, anything like that

4    live in this area?

5         A.  No.

6         Q.  Okay.  What is your current address?

7         A.  4228 Highway 309, Byhalia, Mississippi.

8         Q.  And is that a home that you own or rent?

9         A.  Rental.

10        Q.  Rental.  How long have you been there?

11        A.  About two years and two months.

12        Q.  Do you live alone there or does somebody else

13   live with you?

14        A.  Yes, I live alone.

15        Q.  Has anybody ever lived with you there?

16        A.  No.

17        Q.  Going back just before then, did you live at

18   the 1777 Trapper Drive address in Hernando?

19        A.  Yes, I did.

20        Q.  So that would have been directly prior to the

21   Byhalia address?

22        A.  Yes.

23        Q.  Okay.  How long did you live at the

24   1777 Trapper Drive address?

25        A.  From 2004 to 2018.

George Welch -- May 24, 2021

Page 12

1    Q.  2004 to 2018.  Okay.  And was that a home that
2    you owned or rented?
3    A.  Owned.
4    Q.  Okay.  Did anybody live with you at that home
5    during that time period?
6    A.  Yes.  Cynthia.
7    Q.  Okay.  And she lived with you until 2011?
8    A.  Yes.
9    Q.  Okay.  How long were you and Cynthia married?
10   When did you get married, do you remember?
11   A.  2004.
12   Q.  So from 2004 to 2011 she lived with you at that
13   Trapper Drive address the whole time?
14   A.  Yes.
15   Q.  Okay.  From 2011 to 2018, did anybody live with
16   you at that home?
17   A.  I had a girlfriend lived there for maybe six
18   months.
19   Q.  Okay.  What is her name?
20   A.  I can't think of her last name.  That's
21   embarrassing.  Karen Taylor.  Karen.
22   Q.  Karen?
23   A.  Karen.
24   Q.  Karen Taylor?
25   A.  Yeah.

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 20

1    that right?

2         A.  Yes.

3         Q.  Okay.  Have you ever been sued before for

4    anything?

5         A.  No.

6         Q.  Okay.  Has anybody ever sued you before?

7         A.  No.

8         Q.  Okay.  Have you ever been involved in any other

9    type of legal proceedings at all other than this

10   lawsuit?

11        A.  None.

12        Q.  Well, what about -- so other than this

13   particular -- I know there was a criminal case that this

14   lawsuit grew out of.  Is that the only criminal

15   proceeding you've ever been involved in?

16        A.  Yes.

17        Q.  Okay.  But, now, have you ever been involved in

18   any bankruptcies before?

19        A.  Yes.

20        Q.  Okay.  Tell me about how many times have you

21   filed for bankruptcy?

22        A.  Two times.

23        Q.  One in 2017 and one in 2018; is that right?

24        A.  Yes.

25        Q.  Okay.  Other than this particular lawsuit, have

George Welch -- May 24, 2021

Page 21

1    you ever sued anybody else before?

2         A.   No.

3         Q.   Have you ever had any kind of judgment taken

4    against you before, either by creditors or anything like

5    that, that you're aware of?

6         A.   Not that I'm aware of.

7         Q.   Okay.  Let me ask you about the bankruptcies.

8    The one in 2007 --

9         A.   2017.

10        Q.   2017.  I'm sorry.  I appreciate you correcting

11   me.

12             In 2017 did you have a lawyer that helped

13   you with that bankruptcy?

14        A.   Yes.

15        Q.   Okay.  Who was that?  Who represented you?

16        A.   I can't remember his name.  He is in Hernando.

17        Q.   Okay.

18        A.   Right there at the corner of the four-way stop.

19   I can't think of his name.

20        Q.   What was the outcome of that bankruptcy

21   proceeding?  Were you discharged?

22        A.   It was a court date missed and the lawyer

23   dropped it.  So that's why I went and got Heidi Milam to

24   do the 2018.

25        Q.   Okay.  So your understanding is that the first

George Welch -- May 24, 2021

Page 22

1    one that got filed you didn't get any relief out of

2    that, nothing was discharged?

3         A.   No.

4         Q.   And so your understanding is that it was just

5    dropped because your attorney didn't show up to a

6    hearing?

7         A.   I didn't show up to a hearing.  They didn't

8    give me the paperwork to tell me that I was supposed to

9    be at a hearing in Oxford.

10        Q.   All right.  So you refiled in 2018; is that

11   right?

12        A.   Yes.

13        Q.   Who represented you the second time?

14        A.   Heidi Milam.

15        Q.   Is that a female, Heidi?

16        A.   Yes.

17        Q.   Where is she at?

18        A.   Southaven.

19        Q.   What was the result of that one?  Did you get a

20   discharge of that one?

21        A.   Discharged, too.  I guess, the same process.

22   The court dates, for some reason, they didn't give me

23   the court date.  And they -- the judge dismissed it.  So

24   I had to start all over.  And just on my own, I guess.

25        Q.   Okay.  Well, let me ask you this.  Out of the

George Welch -- May 24, 2021

Page 23

1   second filing in 2018, did you get any -- did you get

2   any relief out of that at all?  Did they discharge any

3   of your debts or did --

4        A.  Yes.  Yes.

5        Q.  What --

6        A.  I can't remember.  They sent me the thing.

7   They discharged some of the debts, but some of them I

8   still have.

9        Q.  Do you remember what the date would have been

10  that they were discharged, the debts?

11       A.  No.  No.

12       Q.  It's my understanding -- I have the -- I have

13  that case being closed in December -- on December 10th

14  of -- well, no, I take that back.  I'm looking at the

15  wrong one.

16            On the 2018 one I have that one being

17  closed on June 10th of 2019.  Does that sound about

18  right?

19       A.  I'm not sure.

20       Q.  Okay.

21       A.  I'm not sure.

22       Q.  But if any of your debts would have been

23  discharged on that second bankruptcy, it would have been

24  somewhere in the time period from the beginning of 2019

25  to June 10, 2019.

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 24

1          Is that fair?

2     A.   Yes.

3     Q.   Do you -- as you sit here today, do you recall

4 any -- I know you may not recall specific things, debts

5 that were discharged or that were relieved, but what was

6 the nature of them?  Were they related to cars?  Were

7 they credit cards?  What was it that you got relief out

8 of that proceeding?

9     A.   One credit card.

10    Q.   One credit card?

11    A.   That's all I have on that credit card.

12    Q.   And do you know who you had that with?

13    A.   Capital One.

14    Q.   All right.  So you received some debt relief

15 because of that bankruptcy proceeding from Capital One

16 credit card; is that right?

17    A.   That's it.

18    Q.   All right.

19    A.   That's the one I know I got relief from.

20    Q.   What happened after they relieved the debt?

21 Did you just not have the credit card anymore or --

22    A.   I didn't have the credit card for three years

23 prior.

24    Q.   Okay.  Do you recall as part of that bankruptcy

25 proceeding having to fill out what they call schedules

George Welch -- May 24, 2021

Page 25

1    that list your assets and income, that kind of stuff?

2              Did you have to fill out that kind of

3    paperwork?

4         A.   I don't remember filling out that kind of

5    paperwork.

6         Q.   Okay.

7         A.   I do remember filling out income, but assets, I

8    don't remember.

9         Q.   Okay.  But you would have had a lawyer that

10   would have worked with you on any of that kind of

11   paperwork; is that right?

12        A.   Yes.

13        Q.   Okay.  Have you ever sat on a jury before?

14        A.   No.

15        Q.   Okay.

16        A.   No.  I've been called for jury duty, but I've

17   never sat on a jury.

18        Q.   Tell me just a little bit about your

19   educational background.  Did you graduate from high

20   school?

21        A.   Yes.

22        Q.   Where did you graduate from?

23        A.   Meridian High School.

24        Q.   What year?

25        A.   1983.

George Welch -- May 24, 2021

Page 28

1    going next.

2                 Are you -- let's just start from now and

3    backwards.  Are you currently employed?

4         A.  Self-employed.

5         Q.  Okay.  And what is -- and you have your own

6    business, right?

7         A.  Yes.

8         Q.  What is the name of your business?

9         A.  Geo Transportation.

10        Q.  Geo Transportation?

11        A.  Uh-huh.

12        Q.  And how long have you had that business?

13        A.  Since 2016.

14        Q.  So from 2016 to present, have you worked

15   anywhere else or have you only been self-employed

16   through Geo Transportation?

17        A.  Only self-employed.

18        Q.  Tell me what Geo Transportation is.  What kind

19   of company is it and what do you do?

20        A.  Transport cars.

21        Q.  Okay.  For anybody.  In particular?  Do you

22   have contracts with different people?  Who do you

23   transport cars for?

24        A.  I have my own authority.  I can transport for

25   anybody.

George Welch -- May 24, 2021

Page 29

1      Q.  Okay.

2      A.  But I have subcontracts.  I have contracts with

3  Audi; I have contracts with Mercedes Benz.  I got a

4  partial contract with Acura of Memphis.

5      Q.  So anybody who needs your services, you're able

6  to service them if they ask?

7      A.  Yeah, because I have my own authority.

8      Q.  Okay.  How do people hear about you?  Do you

9  advertise or how would somebody come find you?

10     A.  I'm on Central Dispatch.

11     Q.  What does that mean?

12     A.  That's a dispatching site, transportation

13  dispatch site.

14     Q.  Like a website?

15     A.  Uh-huh.

16     Q.  So you basically list yourself on there and --

17     A.  And word of mouth.

18     Q.  So do dealerships go on this website to find

19  people?  Is that how it works?

20     A.  Well, they go in and list cars on the site.

21     Q.  Okay.

22     A.  And we call the dealer and tell them we can

23  haul for them.

24     Q.  Okay.  And forgive me for just not knowing what

25  I don't know.  But what exactly are you doing?  Are you,

George Welch -- May 24, 2021

Page 30

1    like, taking vehicles from dealership to dealership or

2    from dealership to customer or how --

3         A.   All of them.   Dealership to dealership;

4    dealership to auctions, dealership to customers.   All of

5    them.

6         Q.   Is it fair to say that most of the work you do

7    are for specific dealerships?

8         A.   And specific brokers and dealerships now, yeah,

9    pretty much.

10         Q.   What is the difference between a broker and a

11    dealership?

12         A.   Well, the dealerships use brokers.   A lot of

13    the dealerships use their own.   They call it brokering

14    now.   They brokering out.   They broker out their own,

15    and most of the dealers use a broker, which is actually

16    a middle man who sets up all the transportation.

17         Q.   Okay.   Is that solely what the broker is

18    supposed to be doing is figuring out the transportation

19    aspect of it, or are they trying to sell cars or --

20         A.   We deal with nothing but transportation.

21         Q.   Is there a particular broker that you deal with

22    mainly, or is it just a bunch of different --

23         A.   Probably you could say a bunch of different,

24    but I have some that is repeat.

25         Q.   I got you.   Okay.   Right now do you have

George Welch -- May 24, 2021

Page 31

1    contracts with any particular dealerships?

2        A.  Audi and Acura.

3        Q.  Are those in Memphis or Mississippi or where?

4        A.  Memphis.

5        Q.  And how long have you had those contracts?

6        A.  Acura, probably a year.  Audi, probably two

7    years.

8        Q.  Okay.  What kind equipment does your -- do you

9    or your business own to perform this service?

10       A.  5500 dually, a 3500 dually, and a four-car

11   trailer.

12       Q.  Four-car trailer?

13       A.  I haul four cars at a time.

14       Q.  So do you have just one trailer?

15       A.  One trailer.

16       Q.  Okay.  How long have you had that trailer?

17       A.  Since 2017, this particular trailer.

18       Q.  Okay.  And so is that the only trailer you've

19   had from 2017 to the present?

20       A.  No.  I had a 40-foot flatbed that I sold in

21   2018.

22       Q.  In 2018?

23       A.  Uh-huh.

24       Q.  Okay.  Did you sell the flatbed before or after

25   the incident that we are here about today?

George Welch -- May 24, 2021

Page 32

1      A.  Before.

2      Q.  Okay.  So at the time that this incident

3   happened that we are here about today, the only trailer

4   you had was the four-car trailer?

5      A.  Uh-huh.  (Nods head.)

6      Q.  Okay.  And at the time of the incident we are

7   here about today, did you have the two duallies?

8      A.  No.  Just one.

9      Q.  One?  Okay.  And what kind of dually was it?

10     A.  A Dodge 3500.

11     Q.  Okay.  What year is it?

12     A.  2018.

13     Q.  Okay.  And the trailer and the truck, they were

14  both owned in the name of Geo Transportation, LLC?

15     A.  Uh-huh.  (Nods head.)

16     Q.  Do you have any employees, or is it just you?

17     A.  Just me.

18     Q.  Have you ever had any employees?

19     A.  No.

20     Q.  Ever had any -- anybody provide any work for

21  you at all, whether independent contractors or anything

22  like that?  Has it always been just you?

23     A.  As far as what?  Explain.

24     Q.  Well, some people might say, well, I don't have

25  any employees, but every now and then I'll hire Joe Blow

George Welch -- May 24, 2021

Page 33

1   to do something for me.  They are not my employee, but

2   he does some work for me.

3                  Have you ever had anybody like that, or is

4   it just you?

5      A.  No.  Just me.  Not hauling cars.  I had my

6   daughter add up my numbers, but as far as hauling cars,

7   no one hauled a car for me.

8      Q.  Okay.

9      A.  Too much liability.

10     Q.  I understand.  At the time of the incident that

11  we are here about today, did you have any contracts with

12  any dealerships at that time?

13     A.  Yeah.

14     Q.  Okay.

15     A.  Mercedes Benz of Collierville.

16     Q.  Collierville?

17     A.  Mercedes Benz of Collierville.

18     Q.  Did you have any other ones?

19     A.  Not at that time.

20     Q.  So at the time of the incident we are here

21  about, was Mercedes Benz of Collierville providing you a

22  hundred percent of your work?

23     A.  No.

24     Q.  Okay.  Where was the rest of the work coming

25  from?

George Welch -- May 24, 2021

Page 34

1      A.  Off of Central Dispatch.

2      Q.  So just to make sure I understand this, the

3   Central Dispatch deal, those aren't necessarily

4   contracts; those are just like one-off jobs here and

5   there.  Is that right?

6      A.  It's like -- Central Dispatch works as -- these

7   dealers are independents, put their cars on

8   Central Dispatch with a contact number, okay, with a

9   rate.  And you call and you agree on a rate up or down

10  from what they put on there, and we set up an individual

11  contract for each one.

12     Q.  So for an individual haul?

13     A.  Uh-huh.  (Nods head.)

14     Q.  So, basically, you have, as I appreciate it, at

15  the time of the incident we are here about -- and now

16  there's essentially two types of hauls that you do.

17  Sometimes you'd have contracts with dealerships where

18  you do consistent work?

19     A.  Uh-huh.

20     Q.  Is that correct?

21     A.  Yes.  They contract with dealerships -- to

22  understand contracts with dealerships, dealerships do

23  not put anything on Central Dispatch.  They call me

24  directly.

25     Q.  Okay.

George Welch -- May 24, 2021

Page 35

1      A.  And I am basically broker and hauler.  There's

2  no middleman.

3      Q.  Okay.  And then the Central Dispatch web site

4  that you're talking about, those are individual hauls?

5      A.  Yes.

6      Q.  You go in there and you essentially bid on

7  them?

8      A.  Uh-huh.  That's it.

9      Q.  Who is putting stuff on the Central Dispatch if

10  not dealers?  Is it just like individuals?

11      A.  You could go on there.

12      Q.  If I was trying to sell a car?

13      A.  You join Central Dispatch and you could put

14  anything you want to move.

15      Q.  Okay.  If somebody -- if I was to get on the

16  Internet and Google it, how would I find that website?

17  Would I say centraldispatch.com?

18      A.  That's it.

19      Q.  Okay.  Prior to having your own business in

20  2016, where did you work before that?

21      A.  UPS.

22      Q.  All right.  And as I understand it from your

23  discovery responses, I think you put maybe like 1992 to

24  2015.  Is that how long?

25      A.  Uh-huh.  (Nods head.)

George Welch -- May 24, 2021

Page 36

1   Q.  And from 1992 to 2015, is that the -- is that
2   the only job that you had during that time period?
3   A.  That's it.
4   Q.  And did you retire from UPS?
5   A.  Yeah, retired.
6   Q.  How did you get into the hauling cars business
7   like that after UPS?  Did you have any kind of prior
8   experience before?
9   A.  No, just some friends.  Friends were doing it,
10  and I just inquired with them.
11  Q.  Okay.  The UPS job, where was that at?  What
12  city and state?
13  A.  My last location was Memphis, Tennessee.
14  Q.  Okay.  But there -- you had worked at other
15  ones, too?
16  A.  Yes.  I was acting supervisor/manager, and I
17  went on assignment in the Midwest and Southeast.
18  Q.  Okay.  Is that what brought you to Memphis was
19  that job, the UPS job?
20  A.  No.  No.
21  Q.  Okay.  All right.  Besides the arrest involving
22  the incident that we are here about in this lawsuit,
23  have you ever been arrested for any other reason before?
24  A.  No.
25  Q.  Okay.  Does your Geo Transportation business,

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 37

1   do you have like a central business location, or is it

2   just your house address?

3       A.  At my address now.

4       Q.  Have you ever had an actual physical building

5   or central location?

6       A.  I used to park at Motor Scooter Cove, but now

7   one of the reasons I moved to Byhalia is for the space

8   to park equipment.

9       Q.  All right.  Tell me about Motor Scooter Cove.

10  What is that?

11      A.  That's in Nesbit, right there, down the same

12  street where the post office is at.  I used to park over

13  there.  I used to park over there at the -- the truck

14  line is CITI.

15      Q.  All right.  Tell me that again.  Now, there's a

16  -- there's a --

17      A.  There's a truck line there.

18      Q.  Okay.  And a truck liner is just --

19      A.  A truck line.  A trucking line, just like UPS,

20  FedEx.  It's a truck line.  The guy runs 37, 38 trucks,

21  I guess.  And I paid him to park in a spot.

22      Q.  Okay.  Do other people do that -- do that --

23  was it somebody -- when you say it's a truck line, is it

24  somebody that has their own business and --

25      A.  Yes.

George Welch -- May 24, 2021

Page 38

1        Q.   -- they send -- they send trucks --

2        A.   Yes.

3        Q.   They just let you park there along with theirs?

4        A.   Yeah.  I mean, I paid for a spot.

5        Q.   And that's on Motor Scooter Cove?

6        A.   Motor Scooter Cove.

7        Q.   And that was in Southaven?

8        A.   Nesbit.

9        Q.   Nesbit.  Okay.

10             How long did you pay to park on

11   Motor Scooter Cove, from when to when?

12        A.   Hmmm.  Started in probably about March of '17.

13        Q.   Okay.

14        A.   Until I moved.

15        Q.   Until you moved to Byhalia?

16        A.   Uh-huh.

17        Q.   Which would have been what year?

18        A.   April of 2019.

19        Q.   And you just had a parking spot there, right?

20        A.   Uh-huh.  (Nods head.)

21        Q.   How far was Motor Scooter Cove where you parked

22   at from your house on Trapper Drive?  What distance is

23   that?

24        A.   Five miles.

25        Q.   Okay.  How much did you pay to park there?

George Welch -- May 24, 2021

Page 39

```
 1        A.   How much did I pay to park there?

 2        Q.   Uh-huh.

 3        A.   $100 a month.

 4        Q.   $100 a month?

 5        A.   Yeah.

 6        Q.   Who is the person that you contracted with to

 7   be able to do that?

 8        A.   Mitch Goree.

 9        Q.   Mitch?

10        A.   Goree.

11        Q.   Goree?

12        A.   Uh-huh.

13        Q.   Where does he live?

14        A.   I guess, Hernando.

15        Q.   Does he own that business, or is he just like a

16   supervisor or something?

17        A.   He owns it.

18        Q.   Okay.  I'm sorry.  You probably told me this,

19   but tell me again, what is the name of his business?

20        A.   CITI, Capital Investment Transportation

21   something.  I don't know where he got the initials, but

22   the prefix is CITI.

23        Q.   Who does he haul for?

24        A.   Everybody.

25        Q.   Is he in the automotive industry, too?
```

George Welch -- May 24, 2021

Page 40

1    A.  No.  Container trailers and boxes.

2    Q.  Okay.  So you would park your truck there, but

3  you never had a physical business site, right?

4    A.  No.

5    Q.  Okay.  I guess, where does the mail that, you

6  know, somebody would send for your business, does that

7  go to your home address?

8    A.  No.

9    Q.  Where does it go?

10    A.  It goes to my business P.O. box.

11    Q.  P.O. box.  Okay.

12         Okay.  I want to talk to you now about what

13  we are here about in the lawsuit.  The lawsuit stems

14  from your arrest by a Hernando police officer for

15  obstructing traffic, resisting arrest and failure to

16  obey on December 23, 2018, right?

17    A.  Yes.

18    Q.  Let's start with just the people that you've --

19  that you sued.  Your Complaint says that you are suing

20  the City of Hernando, Joseph Harris, Robert Scott,

21  Roger Swatzyna, and Adrian Lewis; is that right?

22    A.  Yes.

23    Q.  First off, tell me why you sued the City of

24  Hernando.

25    A.  Because everything that was done was unlawful.

George Welch -- May 24, 2021

Page 45

1   and you couldn't pick him out, why did you sue him?

2              MR. PERRY:  Object to the form.

3              You can answer if you can.

4       A.  Okay.  He was one of the officers.  It was two

5   officers, two cars full of officers.  Okay?

6       Q.  Uh-huh.

7       A.  One of them came up there -- actually the only

8   officer there that treated me with respect is the

9   Lieutenant.

10      Q.  Harris?

11      A.  Scott.

12      Q.  Scott?  Okay.

13      A.  Harris was the arresting officer.

14      Q.  I got you.

15      A.  Scott treated me with respect.  Everybody else

16  harassed me.

17      Q.  When you say "harassment", what do you mean by

18  that?

19      A.  "That's what you get.  That's what you did,"

20  stuff like that.  You've been parking the trailer there

21  forever, that kind of stuff.  But, actually, when we

22  called out on him and actually when he was calling out,

23  it was actually illegal and the judge proved that.

24      Q.  Okay.  All right.  You mentioned people saying

25  that you've had that parked there and them having to

George Welch -- May 24, 2021

Page 46

1    come out there.  Let's start with before the incident.

2                    How many times before December 28, 2018,

3    had officers been over there about --

4         A.  December 23rd.

5         Q.  I'm sorry, December 23, 2018 -- had officers

6    been over there because of where your truck was parked?

7         A.  I'm not sure.

8         Q.  Okay.  Let me -- let's do this.  Let's make

9    this Exhibit 1 to your deposition.

10                   (DISPATCH LOG MARKED AS EXHIBIT NO. 1.)

11        Q.  All right.  Prior to December 23, 2018,

12   officers had been over there about your truck being

13   parked on the road; you just don't remember how many

14   times.  Is that right?

15        A.  Uh-huh.  (Nods head up and down.)

16        Q.  What I've handed you right now is a dispatch

17   log from the Hernando Police Department, and if you will

18   just take a look at it, you see the columns at the top?

19        A.  Uh-huh.

20        Q.  See there's a dispatch number and there's

21   agency and just keep going on and it says location and

22   incident report number and all that?  You see those

23   different columns?

24        A.  Uh-huh.

25        Q.  Down on the location column, you see each one

George Welch -- May 24, 2021

Page 47

1    of those entries say 1777 Trapper Drive.

2                    You see that?

3        A.   Uh-huh.

4        Q.   And that's your address, right?

5        A.   That's it.

6        Q.   Just take a look at this for me and you'll see

7    the dispatch dates and the officer and all of that.   I

8    want to see if this refreshes your recollection, at

9    least about some of the times the officers had been over

10   there.

11                   So take a moment to look at it and we'll

12   talk about it.

13       A.   (Reviews.)   The other thing, too, they got me

14   listed as calling here, and that's not my phone number.

15   The very last one, that's actually Wayne Perkins'

16   number.

17       Q.   Okay.

18       A.   So this report, the two last ones are wrong

19   because I never called.   I called to ask about a ticket

20   because they put a ticket on my window.   And see where

21   it say "Information," why I called, that was somebody

22   put a ticket on my window that day.

23       Q.   Which one are you talking about?

24       A.   Next to the last one.

25       Q.   Next to the last one.   Okay.

George Welch -- May 24, 2021

Page 48

1      A.  See, I was calling for information.

2      Q.  So you're looking -- just to make sure we are

3   clear for this transcript here, you're talking about the

4   one from March 22, 2017, right?

5      A.  Yes.

6      Q.  And it says, "Caller, George Welch," and then

7   it has 901-598-9333?

8      A.  Uh-huh.  That's my number.

9      Q.  That's your phone number, right?

10      A.  Uh-huh.

11      Q.  You called on that incident, right?

12      A.  Yes.  That's for information on a ticket they

13   put on my windshield.

14      Q.  What was the ticket for?

15      A.  Parking.

16      Q.  Okay.  And do you know, was it this patrolman,

17   Perry Thornton, that wrote the ticket?

18      A.  I don't know.  He just left it on the

19   windshield, and I was out of town when it happened.

20      Q.  Okay.  What did the -- what was -- it was just

21   a parking ticket?

22      A.  Uh-huh.

23      Q.  Okay.  And what did you -- who did you talk to

24   when you called?

25      A.  I'm not sure.  I just called the Hernando City

George Welch -- May 24, 2021

Page 49

1    and asked where I needed to pay the ticket.

2        Q.  Did you pay the ticket?

3        A.  Yes, I did.

4        Q.  How much was it?

5        A.  I want to say it was 125.

6        Q.  125?

7        A.  Uh-huh.

8        Q.  Okay.  And was your vehicle parked on

9    approximately the same place then that it was on the

10   date of this incident?

11       A.  No.  No.

12       Q.  Okay.  Where was it parked then when you got

13   that ticket?

14       A.  On Carlee.  Carlee and Trooper joins.  It was

15   on the Carlee side of the street, on the side of my

16   house instead of the front.  I live on a corner lot.

17       Q.  And then you said there's a mistake on this

18   log.  You said the last one that would have been on

19   here, 3/21/2017, which, I guess, would be technically

20   the first one.  It's got your name as the caller, and

21   then it's got 901-239-6789.  But we said that's actually

22   Wayne Perkins' number, right?

23       A.  Yes.  That's the one he called on the other

24   ones.

25       Q.  All right.  Okay.  Let's start with that one.

George Welch -- May 24, 2021

Page 50

1   Do you recall that on March 21, 2017?

2       A.  I don't recall.  The only ones I recall really

3   date-wise are the last two.

4       Q.  Okay.  And so it says March 21, 2017, and you

5   said that was Wayne Perkins that called, and then we see

6   it says Call Type, and it says Parking Violation.

7               Do you see that?

8       A.  Uh-huh.  (Nods head up and down.)

9       Q.  So that would have been whenever you -- the

10  ticket was left on your windshield, right?

11      A.  The 22nd, yeah.  I mean, the 21st.

12      Q.  Well, it's got the 21st and then it says you

13  called on the 22nd.  Are those dates accurate?  Is that

14  how it went down?  The ticket was left on the 21st and

15  then you found it and called about it on the 22nd?

16      A.  Yes.

17      Q.  All right.  Then let's go up to the next one.

18  There's one on 3/29/2017.  And it again it says Wayne

19  Perkins called.  You see that?

20      A.  Yeah, I guess so.

21      Q.  Okay.  And then it says the officer listed is

22  Brian Bell.

23              Did they come out to your house on that

24  date?

25      A.  I'm not sure.  I mean, they came to the house,

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 51

1    I'm not sure if they came or I was gone or whatever.

2         Q.  Prior to December 23, 2018, is this March 21st

3    occasion, is that the only other time that you had

4    received a ticket for the parking?

5         A.  Yes.

6         Q.  Okay.  But there had been other occasions where

7    they actually came out to your house that they didn't

8    give you a ticket, right?

9         A.  Yes.

10        Q.  They told you to move the vehicle?

11        A.  Yes.

12        Q.  And did you move it?

13        A.  Yes.

14        Q.  Okay.

15        A.  I moved the vehicle because of courtesy.

16   Because I'm not a member of the homeowners association.

17   They had already -- they said in one of the reports that

18   I wasn't required to move the vehicle because I wasn't

19   doing anything illegal.  I did it for courtesy, and even

20   the judge said it was not illegal.

21        Q.  Yeah.  I understand about the criminal

22   proceeding.  Tell me about the homeowners association.

23   What are you saying about that?

24        A.  I'm not a member of the homeowner association.

25   I was there before the homeowners association.  I had

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 52

1 been there that long.  I think I was the fifth person

2 that moved in the neighborhood.  We didn't have a

3 homeowners association.

4     Q.  So you were not required to join the

5 homeowners association?

6     A.  Yeah.  That's if you do anything -- I was

7 grandfathered in before the homeowners association.  It

8 was nine houses in the neighborhood that was not a

9 member of the homeowners association because we were

10 grandfathered in before they had one.  And it was our

11 choice to join it or not.

12     Q.  What is the name of the homeowners association?

13     A.  I don't know.

14     Q.  Okay.  Let me ask you this.  I know the address

15 is Trapper Drive, but is there -- is that --

16     A.  The subdivision is Forest Meadows.

17     Q.  Forest what?

18     A.  Meadows.

19     Q.  Forest Meadows?

20     A.  Uh-huh.  But I don't know the name of the

21 homeowners association.

22     Q.  I guess what I'm saying is what does the

23 homeowners association have to do with the parking

24 situation?  Help me with that.

25     A.  I don't know.  I'm not a member.  I don't know

George Welch -- May 24, 2021

Page 53

1    the bylaws.

2        Q.  So you don't know whether the

3    homeowners association rules say one way or the other

4    anything about parking; is that right?

5        A.  They apparently did because that's what they

6    said I was doing was violating the homeowners

7    association.

8        Q.  That's your understanding of what Wayne Perkins

9    was complaining about?

10       A.  Uh-huh.

11       Q.  Okay.  So it's your understanding he was

12   calling the cops saying, he's violating the homeowners

13   association?

14       A.  Yes.

15       Q.  Okay.  And your response to that is, I'm not a

16   member of the homeowners association and --

17       A.  I moved my vehicle for courtesy.

18       Q.  Okay.  Okay.

19       A.  And the vehicle was never there over a 12-hour

20   period any time.  I could pull up to get my lunch box

21   and the police would be out there before I could move.

22       Q.  Did that residence have a driveway?

23       A.  Yes.

24       Q.  Okay.  Would the truck and trailer not fit in

25   the driveway, or why was it parked on the street to

George Welch -- May 24, 2021

Page 54

1    begin with?

2        A.  Ease of convenience.  It was just hard to back

3    that trailer up in that drive.

4        Q.  Okay.  You said on this ticket that you

5    received on March 22, 2017, that it was parked on the

6    side of the street.  What was the name of the street it

7    was parked on?

8        A.  Carlee.  C-a-r-l-e-e.

9        Q.  Was it in front of somebody's house or --

10       A.  No.  On my side of the street.

11       Q.  Okay.  On the date of the incident we are here

12   about, where was it parked?

13       A.  In front of my house on Trapper Drive.

14       Q.  Okay.  Any reason about the change of location

15   or just sometimes you parked on the side, sometimes you

16   parked directly in front of your house?  Is there any

17   reason it was in different locations?

18       A.  It was easier on the front side of the house

19   and I could see out the window.  Sometimes I would have

20   250-, $300,000 worth of cars on it.  I couldn't see them

21   outside of the house.

22       Q.  So where you had it parked on the date of the

23   incident we are here about, that was more convenient to

24   you?

25       A.  Yeah.  I could see the vehicles.

George Welch -- May 24, 2021

Page 55

1      Q.  On the other -- on the other occasions where
2  the police came to your house and asked you to move the
3  vehicle and you said you moved it just out of courtesy,
4  was it always parked in the same location in front of
5  your house?
6      A.  Uh-huh.  (Nods head up and down.)
7      Q.  Is that a "yes"?
8      A.  Yes.  I'm sorry.
9      Q.  So the ordinary place you would park it at was
10  in front of your house and not on the side of the
11  street?
12      A.  Yes.
13      Q.  Okay.  Approximately how many times would you
14  say that the police officers came over there and told
15  you to move it and you moved it because of a courtesy?
16  How many times did that happen?
17      A.  Hmmm.  Eight, ten.
18      Q.  Eight or ten?
19      A.  Uh-huh.
20      Q.  Why did you keep parking there if they kept
21  coming over there telling you to move it?  Why did you
22  keep doing it?
23      A.  One, it was depending on what time of the night
24  I would get home.  Two, if somebody had my parking spot
25  at Motor Scooter Cove, I would just drive home.

George Welch -- May 24, 2021

Page 56

1      Q.  Okay.  Let me ask you that.  Why would somebody
2  ever have your parking spot if you were paying the guy
3  $100 a month?
4                MR. PERRY:  Object to the form.  Wait a
5  minute until I object.
6                Go ahead and you can answer.
7      A.  The -- a lot of times -- he owns a fleet, okay?
8      Q.  Uh-huh.
9      A.  And where I park at, see, if he get a new
10  driver or anything of that incident, they may park in my
11  spot that's dedicated to me.
12     Q.  Okay.  And then you said sometimes it was just
13  too late to go there because of how late it was at
14  night, and you just parked on the street?
15     A.  The reason being like on the weekend, and if I
16  didn't get to Motor Scooter Cove on the time of the
17  weekend, someone would always take my spot because his
18  drivers would come in and be out all week.  They come in
19  and be out all week and they park where it's convenient
20  for them.
21     Q.  So any time that you had it parked on the
22  street, it always was because somebody had your spot at
23  where you were paying?
24     A.  Pretty much, uh-huh.  Yes.  And, like I said,
25  it's not illegal to park on that spot, and I was just

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 57

1    doing it for courtesy.  And the other reason is he had

2    security cameras over there where I was parking.  That's

3    one reason I parked there, for the security cams.

4         Q.  At the place where you pay the money?

5         A.  Uh-huh.  (Nods head up and down.)

6         Q.  If you -- I know you said it wasn't illegal.

7    Why did you pay the $125 ticket if you didn't think it

8    was illegal?

9         A.  Just to stop the hassle.

10        Q.  Okay.

11        A.  Any day I lease in Cordova or Hernando, I lose

12   money.

13        Q.  Meaning because you could be out working making

14   money?

15        A.  Yeah.

16        Q.  Okay.  Look back at that sheet for me on

17   Exhibit 1.  If you go up, you see the one on June 13,

18   2018, and June 18, 2018?  They both say Parking

19   Violation.

20             Do you see that?

21        A.  Uh-huh.

22        Q.  Okay.  Your testimony is that you don't

23   remember receiving a ticket on those occasions; you

24   think that they just came out and told you to move it.

25   Is that right?

George Welch -- May 24, 2021

Page 58

1      A.   Yeah.

2      Q.   Okay.

3      A.   I don't think I got a ticket.  I only remember

4  one ticket other than -- that one ticket that they put

5  on the windshield, and then I got ticketed the day I got

6  arrested.

7           MR. PERRY:  On your last question he

8  answered "uh-huh."  And I just want to -- the only

9  reason I'm saying this, I don't want to interrupt your

10 deposition, but from now on, you got to answer "yes" or

11 "no."

12          THE WITNESS:  I'm sorry.  I apologize.

13          MR. PERRY:  No.  I apologize.  Y'all move

14 so fast.

15          MR. BUTLER:  I appreciate that.

16          MR. PERRY:  Yes, sir.

17     Q.   I know you said that the trailer was a four-car

18 trailer; is that right?

19     A.   Yes.

20     Q.   Do you have any idea what the dimensions of it

21 are?  How big is it?

22     A.   Not really.

23     Q.   Okay.  Any idea about what approximate foot,

24 like how many foot trailer?

25     A.   40.

George Welch -- May 24, 2021

Page 59

1    Q.  40-foot.  Okay.

2    A.  It's not as wide as the dually truck.  It's not

3  as wide as the truck, I can tell you that.  It's

4  narrower than the truck.

5    Q.  I think weve got some pictures, too.  We'll

6  look at those here shortly.

7         Did you ever talk to the guy you were

8  renting the spot from about, you know, your parking spot

9  being used?  Did you ever say, hey, man, I'm paying

10  money --

11    A.  Yeah, I called him that night.  He said

12  whatever trailer was there, when his mechanic got there,

13  he'd have him move so I could go park.

14    Q.  All right.  I know this happened on

15  December 23, 2018.  And that was -- it happened in the

16  morningtime, right, this incident we are here about?

17    A.  Yes.

18    Q.  Had the officers been there the night before to

19  your house?

20    A.  Yes.

21    Q.  Okay.  Which officer came the night before?

22    A.  I want to say his name is Bell?

23    Q.  Officer Bell?  What time did he come the night

24  before?

25    A.  Hmmm.  10:30, 11 o'clock.

George Welch -- May 24, 2021

Page 60

1    Q.  10:30 or 11 o'clock p.m.?

2    A.  Uh-huh.

3    Q.  And that would have been on December 22nd?

4    A.  Uh-huh.

5    Q.  Okay.  And what did he tell you when he came?

6    A.  He just -- I mean, he said, I got a complaint,

7  and this is -- they tell me the lady called.  They

8  always say, the lady called, the lady called, and it's

9  actually a man calling, and that, you parked in

10  violation of the parking space, I mean, the parking

11  rules.

12    Q.  And what did you respond?

13    A.  That I had already called because I went to the

14  place where I normally park at.  My spot wasn't there so

15  I just drove to the house.

16    Q.  Okay.  That night, though, you didn't move it.

17  You told them you were going to move it in the morning;

18  is that right?

19    A.  Uh-huh.  As soon as Nate called me to tell me

20  my parking spot was open, I was going to move the truck.

21    Q.  Okay.

22    A.  Because I called -- when I got there and my

23  spot was not there, I called Nate that evening around

24  about 6:30, 7 o'clock.  And he said, when we get in

25  there in the morning to work, we'll move it out of your

George Welch -- May 24, 2021

Page 61

1  spot.  Because I was running on a Sunday.  We'll move it

2  out of the spot where you can get --

3       Q.  Okay.  December 23, 2018, when this happened,

4  what day of the week was that?

5       A.  The 23rd was a Sunday.  I was running that

6  Saturday and came in that Saturday evening.  I normally

7  don't run on weekends.

8       Q.  Okay.  Just want to make sure I got it right.

9  So on Saturday, December 22nd --

10      A.  Is when I came back into town.

11      Q.  You came back into town around 5:00, 6:00,

12  7:00 p.m. right?

13      A.  It was dark.  I remember it was dark when I got

14  there and my spot was took.  I called Nate, and when I

15  called Nate, he said as soon as they get in the next

16  day, they would move the tractor-trailer out of my spot.

17      Q.  All right.  So you had that conversation with

18  Nate?

19      A.  Uh-huh.

20      Q.  And later on that night, Officer Bell comes

21  around 10, 10:30, 11 p.m., right?

22      A.  Yes.

23      Q.  And he says, we got a complaint about your

24  parking?  Is that right?

25      A.  Yes.

George Welch -- May 24, 2021

Page 62

1      Q.   And you said he said it was from a woman?

2      A.   That's what they've told me every time they

3   come there.

4      Q.   Okay.

5      A.   That the lady called again, that -- every

6   police officer that came there has told me it's been a

7   woman called.

8      Q.   And what is your understanding of who you think

9   actually called?

10     A.   I know now who actually called.  I thought it

11   was the woman from the side that was calling.

12     Q.   What is her name?

13     A.   I don't know.

14     Q.   Okay.  Who is Wayne Perkins?  Where does he

15   live?

16     A.   Two doors -- if you are facing my house, two

17   doors up the hill, east of me.

18     Q.   Is he married?

19     A.   Yes.

20     Q.   What is his wife's name, do you know?

21     A.   I don't know.  He has a problem with everybody

22   in the neighborhood.

23     Q.   Okay.  I know the type.  All right.

24          So Officer Bell comes somewhere between 10

25   and 11:00 p.m.?

George Welch -- May 24, 2021

Page 63

1    A.  I think that's his name.  I'm not sure of the

2    name.

3    Q.  Okay.  An officer comes out there and says, we

4    got a complaint, right?

5    A.  Yeah.

6    Q.  And you told them, I'm going to move it in the

7    morning?

8    A.  Yes.

9    Q.  Did you tell them --

10   A.  I said as soon as I get a call in my parking

11   spot.  He was very courteous.  The officer was very

12   courteous.

13   Q.  Did you tell Officer Bell that you were going

14   to have it moved by 7:00 a.m.?

15   A.  No.

16   Q.  Did you ever tell anybody you were going to

17   have it moved by 7:00 a.m. on the 23rd?

18   A.  I told them when I got the call to move it.

19   Q.  What time did you --

20   A.  I said, first thing in the morning when I get

21   the call.

22   Q.  Okay.  You just said, first thing in the

23   morning?

24   A.  Yeah, because I don't know what time these guys

25   get to work.

George Welch -- May 24, 2021

Page 64

```
 1        Q.  Okay.  What time did you expect them to call
 2   and tell you your spot was ready?
 3        A.  About 8:00, 9:00.  That's what time I expected
 4   mechanics coming in to work.
 5        Q.  Okay.  But was Officer Bell by himself that
 6   night when he came?
 7        A.  Yes.
 8        Q.  Okay.  But you don't remember telling him any
 9   specific time?  You just said, first thing?
10        A.  First thing in the morning.
11        Q.  Okay.  Do you know anything about what shift
12   Officer Bell worked that night, what time he would get
13   off work, or anything like that?
14        A.  No.  I don't.
15        Q.  All right.  From the time Officer Bell left
16   somewhere between 10, 11:00 p.m. --
17        A.  Uh-huh.
18        Q.  -- and the time that this incident we are here
19   about today -- it happened around 7:00 a.m. or so,
20   right?
21        A.  In the morning, you're talking about the
22   incident, yeah.
23        Q.  Happened around 7:00 a.m.?
24        A.  7 or 8, something like that, if I'm not
25   mistaken.  And they said the officer that came there, I
```

George Welch -- May 24, 2021

Page 65

1    guess is Michael Ferris that came that night.  No,

2    that's the 21st.

3        Q.  Yeah.  I'm not sure that the one with Bell is

4    on here.  The -- okay.  Let me just ask you.

5            What time do you recall Officer Harris

6    coming the morning of the 23rd?

7        A.  I'm not sure.  I was awoke when he came, and he

8    -- he came and I actually seen him coming.  I was

9    greeting him at the door.

10       Q.  And I understand, we are going to talk about

11   that.  I'm just trying to get a time frame.  You said

12   earlier that you thought --

13       A.  Between 7 and 8.

14       Q.  Between 7 and 8?

15       A.  Yeah.  Between 7 and 8.

16       Q.  All right.  Had you left your house at all from

17   the time you had that conversation with Officer Bell

18   before Officer Harris came?

19       A.  No.

20       Q.  After Officer Bell left that night, do you

21   recall what time you went to bed?

22       A.  I was in the bed when Bell came.

23       Q.  Okay.

24       A.  I went back to bed.

25       Q.  Okay.  Do you recall what time you woke up the

George Welch -- May 24, 2021

Page 66

1   morning of December 23rd?

2       A.  Not offhand.  I know I was awoke when

3   Officer Harris got there.

4       Q.  Okay.  What were you doing when you saw him

5   pull up?

6       A.  What's that?  I was in the house doing routine

7   stuff.  Tending to my dog and all that.

8       Q.  Were you up, dressed, eating breakfast?

9       A.  Yeah.

10      Q.  Okay.  Where did he park at?

11      A.  The west side of my yard below the mailbox.

12      Q.  Okay.  And this is Officer Harris, right?

13      A.  Uh-huh.  (Nods head up and down.)

14      Q.  So he parked on the street?

15      A.  Uh-huh.

16      Q.  And walked up to your driveway?

17      A.  Uh-huh.

18      Q.  And then knocked on your door?

19      A.  Yeah.  I greeted him at the door so he never

20  knocked.

21      Q.  Okay.  Before we get to that, give me generally

22  what -- give me a description just of the outside of the

23  home.  Is it just a house with a yard and a driveway?

24  What does it look like from the outside?

25      A.  House, driveway.  Maybe three-car deep

George Welch -- May 24, 2021

Page 67

1  driveway.

2      Q.  Okay.  How big was the house, do you remember,

3  just square footage?

4      A.  A story and a half.  About 3,000 square feet.

5      Q.  How far off the road does the house sit -- did

6  that house sit?

7      A.  Hmmm.  Maybe 75, 80 yards.  You could put four

8  cars in the driveway.

9      Q.  Let me ask you this.  What vehicles were in the

10  driveway that day?

11      A.  My Mercedes was in the driveway and I think my

12  Toyota was in the driveway.

13      Q.  Okay.  Are both of those cars or --

14      A.  One is an SUV, one is a car.

15      Q.  Just tell me what kind of SUV and what kind of

16  car.

17      A.  Toyota was a -- at the time I had an

18  '02 Avalon.

19      Q.  Okay.

20      A.  And I had a -- the '08 Mercedes.

21      Q.  And that was an SUV?

22      A.  Uh-huh.

23      Q.  And they were both just parked in the driveway?

24      A.  Uh-huh.

25      Q.  And then your dually truck and --

George Welch -- May 24, 2021

Page 68

1    A.  And trailer.

2    Q.  -- trailer was parked on the side of the street

3 in front of the house?

4    A.  Uh-huh.

5    Q.  Yes?

6    A.  Yes.  Yes.

7    Q.  Look, I'm the world's worst about it.

8    A.  I'll apologize a hundred more times.

9    Q.  No need to apologize.  Just don't get mad at us

10 when we remind you.

11    A.  That's your job, man.

12    Q.  Okay.  You said that you -- that he never had

13 to knock because you met him.  Did you walk all the way

14 outside?

15    A.  I walked outside.  He was walking across the

16 yard towards the driveway.

17    Q.  Is there like a porch on the house, or do you

18 just go directly out into the yard?

19    A.  Just a little covering.  That's all.  It covers

20 a step as long as this table is across.

21    Q.  Did you meet him in the grass or driveway?

22    A.  Met him in the driveway.

23    A.  Uh-huh.

24    Q.  Just a concrete driveway?

25    A.  Yeah.

George Welch -- May 24, 2021

Page 69

1      Q.  Make that Exhibit 2.

2           (PHOTOGRAPHS MARKED AS EXHIBIT NO. 2.)

3      Q.  All right.  Mr. Welch, somebody way smarter

4  than me was able to get these and print them off of

5  Google Earth, I guess.

6           But let me just ask you, is this -- the

7  first page that we are looking at shows this wide view

8  layout of the neighborhood, and you'll see there's a red

9  indicator that says 1777 Trapper Drive.

10          Do you see that?

11     A.  Uh-huh.

12          MR. PERRY:  "Yes" or "no"?

13     A.  Yes.  Yes.

14     Q.  Does that -- does that accurately --

15     A.  That is accurate.

16     Q.  Does this picture accurately depict what that

17  road area would look like --

18     A.  Yes.

19     Q.  -- on December 23, 2018?

20     A.  Yes, it does.

21     Q.  Let's go to the second page there.  This is a

22  closer shot of -- which one of these houses would have

23  been the one you lived in?

24     A.  The very first one you see.  You see where the

25  mailbox is at?  The house is there in front of it.

George Welch -- May 24, 2021

Page 70

1      Q.  Tell you what, let me just give you a pen.  If

2  you could just put an "x" on --

3      A.  You want it on your copy?

4      Q.  No, put it on yours.  You got the official --

5          Let me look at that, and I'm going to hand

6  it to them, too.

7      Q.  Tell you what, let's do this.  It's kind of

8  hard to see.  Why don't you do this?  Draw an arrow just

9  down for me.  Put it right up here.

10     A.  Okay.

11     Q.  Just so we know which house it is.

12     A.  (Marks.)

13     Q.  That's perfect.  Thank you, sir.  (Reviews.)

14  Let me give it back to you.  I'm stealing your copy.

15  Looking at that same picture where you just drew an

16  arrow to, where -- where would the truck approximately

17  have been parked at?  I'm going to give you a pen again,

18  and I want you to just write the word "Truck" just in

19  the general area where it would have been parked at.

20     A.  It would have been east of the mailbox -- east

21  of the driveway.

22     Q.  And you're going to write the word "truck"

23  there for me?

24     A.  (Marks.)

25     Q.  Let me look at this.  Okay.  That's helpful.  I

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 71

1    appreciate that.

2           Let me ask you one more thing about that

3    picture.  So the picture where you marked the house and

4    where the truck would have been, just looking at that

5    picture, we also can see a mailbox and a driveway that

6    is closest to the house.

7           Do you see that?

8    A.  Yes.

9    Q.  Is that your driveway and your mailbox?

10   A.  That is my driveway and my mailbox, yes.

11   Q.  Okay.  And is that the driveway that you say

12   you met Officer Harris at?

13   A.  Yes.

14   Q.  Okay.  Where in relation was his police car

15   parked at?  Was it on the other side of the mailbox?

16   A.  Other side of the mailbox.

17   Q.  Okay.  All right.  Do this for me.  On that

18   same exhibit, just write "Police car" approximately

19   where his car was parked at.

20   A.  (Marks.)

21   Q.  Let me see the pen again.  Okay.  Do this for

22   me.  Look back on this picture.  You said you came out

23   of your house and that y'all essentially met up when you

24   were walking down the driveway.  Do you recall how far

25   down the driveway you were when y'all first started

George Welch -- May 24, 2021

Page 72

1   talking -- when he got there?

2       A.  Not -- not really.  I know it was before you --

3   before the oak tree.

4       Q.  Okay.

5       A.  Because he had to come across the yard.  He

6   didn't come up the driveway; he come across the yard,

7   and he made it to that first oak tree.

8       Q.  So somewhere close to the first tree, the oak

9   tree?

10      A.  Yeah.

11      Q.  Okay.  And we are talking about that big oak

12  tree in the middle that you can see?

13      A.  Yeah.

14      Q.  Okay.

15      A.  Because it's two oak trees in the yard.

16      Q.  Okay.  This Wayne Perkins fellow, do you know

17  him or have any kind of interaction with him?

18      A.  None whatsoever.

19      Q.  Had you ever even talked to him before?

20      A.  Other than speaking, that's it.  You know, if I

21  walk in the neighborhood, I'll speak.

22      Q.  Never been in his home, he's never been in your

23  home?

24      A.  No.  No.  But he tried to sue my next door

25  neighbor, the guy that live in that house right there,

George Welch -- May 24, 2021

Page 73

1    because he put that shed there.

2        Q.  Okay.  Were there any of the neighbors in that

3    neighborhood that you would consider yourself to be

4    close friends with or anything?

5        A.  Hmmm.  Not really.  I knew Steve, my next door

6    neighbor, and Oz across the street but I didn't even

7    know -- Steve Hubler, I think is his last name.

8        Q.  Steve?

9        A.  Hubler, H-u-b-l-e-r.

10       Q.  And the other person across is Oz?

11       A.  Yeah.  I think that was his last name.  They

12   call him Oz.  But, like I said, I travel so much, even

13   with UPS, I was rarely home.

14       Q.  So you wouldn't consider them good friends,

15   just acquaintances?

16       A.  Yeah.

17              (PHOTOGRAPHS MARKED AS EXHIBIT NO. 3A-H.)

18       Q.  Okay.  Let's enter these as Exhibit 3 and

19   that's -- that's a good idea.  Let's go 3-A through H on

20   those.

21              Mr. Welch, just take a minute and I want

22   you to thumb through and look at all these pictures.

23       A.  (Reviews.)  Okay.

24       Q.  Okay.  I'm going to represent to you that these

25   were pictures that were taken that day of the incident.

George Welch -- May 24, 2021

Page 74

1           Do these -- do you have any reason to

2   dispute that this is where the truck was parked?

3       A.  No.

4       Q.  Are those pictures accurate?

5       A.  These pictures are accurate, yes.

6       Q.  Okay.  And the location of where the truck and

7   trailer were parked, that's accurate as well?

8       A.  Yes.

9       Q.  Okay.  Look at what she marked as 3-G for us.

10      A.  Okay.

11      Q.  What -- what is on the other side of that hill?

12  Is that just -- does the road just go through the

13  neighborhood?

14      A.  Goes straight out to the next road.

15      Q.  Okay.

16      A.  You take it straight out to Thousand Oaks.  I

17  think that's the name of the street.  I'm not sure.  I

18  know I come up that road to come home.  I don't --

19      Q.  Is that like on an incline?  Is that on a hill,

20  on 3-G?

21      A.  It's not really a hill because once you top --

22  it's on a hill going up, but it don't go down.  It just

23  stays flat.

24      Q.  I got you.  Okay.

25      A.  You come up and it's flat.  It ain't like an

George Welch -- May 24, 2021

Page 75

1    up-and-down hill.

2        Q.  How many -- if you know, approximately how many

3    homes are in this subdivision?

4        A.  I don't know.

5        Q.  Okay.

6        A.  I couldn't tell you, because there's some new

7    parts of the subdivision I never was in.

8        Q.  Why did you move out of that subdivision?  Did

9    it have anything to do with the neighbors?

10       A.  That was part of it because I was saying I was

11   going to move before the incident happened because I was

12   steady getting harassed and harassed.  I couldn't -- and

13   the -- it just got bad.  I mean, it's -- I mean, I'm in

14   here with a bunch of grown folks and it's the truth.  I

15   had very racist neighbors.

16       Q.  Okay.

17       A.  I was even told by one of my neighbors that

18   colored people don't have this kind of dog.  I got a

19   giant Schnauzer.  What you do you mean, what, colored

20   people don't have them kind of dogs?

21       Q.  Were most of the neighbors in that

22   neighborhood, were most of them white?

23       A.  Yes.

24       Q.  The Wayne Perkins guy we were talking about, is

25   he white?

George Welch -- May 24, 2021

Page 76

1    A.  Yes.

2    Q.  The guy you said you were kind of friendly

3  with, Steve --

4    A.  Yes.

5    Q.  -- is he white?

6    A.  White.  Oz is white.

7    Q.  Were there any neighbors around you that were

8  not white?

9    A.  Ms. Pat was Hispanic, kind of catty-corner, and

10 I think it was two other black families that I knew

11 lived in that neighborhood.

12   Q.  What part of the neighborhood did they live in?

13   A.  I was in Phase 1, and they were in the newer

14 part of the neighborhood.

15   Q.  Okay.

16   A.  I was in the very -- because the lots in

17 Phase 1 were bigger than the lots that's in there now

18 being built.  They are up to Phase 8 now.

19   Q.  All right.  So let's go back to when the

20 officer -- you saw him pull up and park, right?

21   A.  Uh-huh.

22   Q.  And you said he walked across the yard to the

23 driveway?

24   A.  Yes.

25   Q.  And you met him?

George Welch -- May 24, 2021

Page 77

1    A.  Uh-huh.

2    Q.  About halfway down the driveway?

3    A.  Yeah.

4    Q.  Okay.  Tell me what happened from there.

5    A.  He said, you know what I'm here for.  I said,

6  yes, because my blankity-blank-blank neighbors.  I said,

7  it's the lady, because that's all I've been told is a

8  lady that's been calling, called y'all again.  I said, I

9  told the officer last night I would move as soon as they

10  called and tell me my parking spot was open.

11    Q.  Okay.  And I know you said blankety-blank, but

12  for the record, tell me, do you remember what you said?

13    A.  I know I called -- said the "bitch" word.

14    Q.  Okay.

15    A.  "These bitches had called again", and, you

16  know...

17    Q.  Okay.  Is it fair to say you were frustrated

18  with your neighbors calling all the time?

19    A.  Yeah.  Because the thing is, like I said, it's

20  been to court, it wasn't illegal.  Nothing I did was

21  illegal.  So I was being harassed.

22    Q.  At the time -- you had never been to court at

23  that time, right?

24    A.  I hadn't been to court, but in the report one

25  of the police officers even told me that there was

George Welch -- May 24, 2021

Page 78

1   nothing they could actually do because I was not in the
2   wrong.  If you look at one of the reports, the one the
3   police officer said, because they took it to a judge and
4   the judge said there's nothing that I was doing illegal.
5   I could park there if I wanted to.  I didn't park there
6   for courtesy.
7        Q.  But you are talking about after --
8        A.  This is before things got --
9        Q.  I just want to make sure I know what document
10  you are talking about.  So you are saying that there's a
11  police report prior to December 23, 2018, that says it's
12  okay for you to park there.  That's your understanding?
13       A.  That I wasn't doing nothing illegal.  They
14  couldn't do anything to me.
15       Q.  And you've seen that police report?
16       A.  Yeah, it was in that report.
17       Q.  Do you know what officer --
18       A.  No, I don't.
19       Q.  Okay.
20       A.  I don't know which officer.  I mean, this is my
21  point.  I understand the truck is in the neighborhood
22  and it doesn't look the best.  But when I -- when push
23  come to shove, I parked in the neighborhood because I'm
24  coming home.  If you see that I got a $100,000 car
25  parked on that hill, I want it in front of my house on

George Welch -- May 24, 2021

Page 80

1      Q.   I don't want to hold up our progress because I
2   don't think we've got too much longer and I want to keep
3   going, but when we take a break in a minute, I'm going
4   to ask that you get with your counsel and I want to make
5   sure I see that police report that you're talking about
6   because we may need to talk about that.  Okay?

7      A.   Okay.

8      Q.   Okay.  So you said the officers asked you, do
9   you know what I'm here about, and you said, yeah,
10  neighbors, you know, something to the effect of these
11  bitches calling again, something like that.

12           Is that fair?

13     A.   Yes.

14     Q.   What did he respond with after that?

15     A.   That -- that it was a safety issue with me
16  parking on the side of the street.

17     Q.   And did he tell you to -- did he tell you to
18  move the car?

19     A.   Yes.

20     Q.   And what did you say?

21     A.   I was going to the truck because I had my keys
22  in my pocket.  I was going to the truck to move it.  And
23  he said, I need to see your license.  I said, what do
24  you need to see my license for?  And he said, I need to
25  see your license.  And that's where we get to -- but I

George Welch -- May 24, 2021

Page 81

1    didn't have my wallet on me.  When I realized I didn't

2    have my wallet on me, I was walking back to the house --

3         Q.  Let me stop you real quick.  So in the

4    Complaint or somewhere I read, I think, it says

5    something to the effect of --

6         A.  I don't have to show him the license.

7         Q.  "I don't have to give you shit."  Was that the

8    statement?

9         A.  That is an exaggerated lie.

10        Q.  Tell me what the actual statement was.

11        A.  The actual statement was, "I don't have to show

12   you my license."

13        Q.  Okay.  Hold on a second.

14        A.  I did not direct any cuss words toward him.

15        Q.  Okay.

16        A.  I directed cuss words toward my neighbors, but

17   I did not direct it to the officer.

18        Q.  I understand.

19        A.  He was upset because --

20             MR. PERRY:  Wait until he asks you a

21   question.

22        A.  I'm sorry.  And let's take a break right now.

23             (Break in the deposition.)

24   CONTINUING:

25        Q.  (Mr. Butler:)  Mr. Welch, we are back on the

George Welch -- May 24, 2021

Page 82

1    record.  You understand you are still under oath?

2        A.  Yes.

3        Q.  Okay.  Before we took our break, we were

4    talking about your interaction with Officer Harris, and

5    as I understood your testimony so far, he walks up,

6    y'all meet halfway down the driveway and says -- he

7    says, do you know why I'm here, and you make the

8    comments about your neighbors.

9        A.  Yes.

10       Q.  He tells you to move the vehicle, and you start

11   walking toward the truck; is that right?

12       A.  Right.  I walked down the road towards the

13   truck.

14       Q.  Let me just stop you.

15       A.  Okay.

16       Q.  So then he says -- he tells you to give him

17   your license, right?

18       A.  Yes.

19       Q.  And you said that -- you responded by saying, I

20   don't have to give you my license; is that right?

21       A.  That's right.  I did tell him I didn't have to

22   because I wasn't driving.  I was in my own yard.

23       Q.  Let me -- let's mark this as Exhibit 4.

24              (AMENDED COMPLAINT MARKED AS

25              EXHIBIT NO. 4.)

George Welch -- May 24, 2021

Page 84

1      A.  I don't remember cussing at him.  I cussed

2  about my neighbors because the stuff they did was wrong.

3      Q.  Okay.  And you're mad during this incident?

4      A.  Yeah.

5      Q.  But do you remember using this phrase, "I don't

6  have to show you a damn thing"?

7      A.  I don't remember it.  But if I said it, you

8  know, it was in anger, but I don't remember cussing him

9  at all.

10      Q.  Okay.

11      A.  The thing, I appreciate all types of law

12  enforcement.  My daddy was a deputy for 27 years.  My

13  mother worked as a correctional officer.  So I had this

14  in my family all my life.

15      Q.  I understand.  I'm just asking.

16      A.  But if it's in here, I guess I had to say it.

17  But I don't remember it.

18      Q.  Okay.

19      A.  I don't remember cussing at him at all.

20      Q.  So as you sit here today, you don't remember

21  one way or the other whether you used the phrase, "I

22  don't have to show you a damn thing"?

23      A.  I told him I didn't have to show him my license

24  because I was in my yard.

25      Q.  You just don't remember using that phrase in

George Welch -- May 24, 2021

Page 86

1   sequence.  So originally you told him words to the

2   effect of, I don't have to give you my license?

3       A.  That's right.

4       Q.  Okay.  But then you turned around and you

5   started walking to the house to get your license?

6       A.  Yes, because I didn't have them.

7       Q.  And you just said, I don't --

8       A.  I was going to move my truck.  I got to go get

9   my license to get in my truck.  My license in my wallet.

10  And after they arrested me --

11      Q.  Slow down.  I want to make sure we go in order.

12  So originally you are walking towards --

13      A.  The truck.

14      Q.  So you do have your keys on you?

15      A.  I got my keys.

16      Q.  But you don't have your wallet?

17      A.  Don't have my wallet.

18      Q.  And so you're walking towards the truck with

19  the indication of moving the truck?

20      A.  Yeah.

21      Q.  He asked for your license?

22      A.  License.

23      Q.  And you tell him, I don't have to give it to

24  you?

25      A.  I don't.  I didn't.

George Welch -- May 24, 2021

Page 87

1    Q.  Okay.  And I'm not -- I just want to know

2    factually what happened.

3              All right.  So you told him you didn't have

4    to give him your license?

5    A.  That's right.

6    Q.  But then you turned around and start walking

7    towards your house, right?

8    A.  Correct.

9    Q.  And did you say anything when you were walking

10   toward the house, or were you walking, saying, well, I

11   don't have to give it to him, but I'm going to get it?

12   What was going on there?

13   A.  I don't have to give it to him, but I do have

14   to have my license to drive my truck away from my house.

15   Q.  So that's why you were turning around to go in

16   your house?

17   A.  Yes.

18   Q.  And did you say anything to him or did you

19   just --

20   A.  I told him.  I told him, I said, I don't have

21   my license on me.  When he said that, he said, I need

22   you to get your license.  And I said, I ain't even got

23   my license on me.

24   Q.  Okay.

25   A.  So I was walking to my house through the yard.

George Welch -- May 24, 2021

Page 88

1      Q.  Okay.

2      A.  And he was following me.  And when I got to the

3  door of the house and opened the door of the house,

4  that's when he grabbed my arm, put it behind my back,

5  took his foot and tripped me on the concrete.  At that

6  time I had my phone in my hand, trying to face-time to

7  get somebody to witness what was going on.

8      Q.  Okay.

9      A.  Beverly Harris did not answer the phone.

10     Q.  Okay.

11     A.  Okay.  He took my phone.  He tased me in the

12  back.  Like I was holding my phone like this.  Give me

13  the other hand because he had this hand in handcuffs.

14  I'm trying to face-time.  He tased me in my back.  He

15  finally takes my phone out of my hands because I was

16  holding it trying to make a call.  And he takes my phone

17  and throws it down the driveway and busts the case and

18  the lens on my phone, the what-you-call-it on my phone.

19     Q.  Let me break that down a little bit.

20         All right.  So I thought the whole arrest

21  interaction happened -- did it happen in the driveway

22  or --

23     A.  It happened in my doorway.

24     Q.  Okay.  In the doorway?

25     A.  In the doorway of my home, because I hit -- my

George Welch -- May 24, 2021

Page 89

1    door was pushed down like this.  When I pushed the door

2    back, he grabbed this arm.

3        Q.   Okay.  Okay.  Hold on.  Hold on.  Tell me about

4    the handle on your door.  Is it like a round doorknob

5    or --

6        A.   The kind you just push down.

7        Q.   And so you, when you reached for the --

8        A.   To push it down.  I had pushed it down and

9    opened the door because he let my dog out.

10       Q.   Okay.  And then he grabbed which arm?

11       A.   My right arm -- I mean, my left arm, because I

12   had my right arm.  That's the one he had behind my back

13   with the handcuff and his knee in my back.

14       Q.   So you reached for the doorknob with which

15   hand?

16       A.   Right hand.

17       Q.   Right hand.

18       A.   And he grabbed my left hand.

19       Q.   Where is the phone at at this point?

20       A.   In my right hand.

21       Q.   In the same hand that you're going to do the

22   door?

23       A.   Uh-huh.

24       Q.   Had you already started dialing though?

25       A.   I dialed.  I had face-timed Beverly Harris.

George Welch -- May 24, 2021

Page 90

1    It's my iPhone.

2        Q.  So it's ringing at the same time in the same

3    hand that you're pressing the door, right?

4        A.  Yeah.  And when the phone start ringing, it

5    just seemed like that was his cue that he didn't want it

6    to happen.

7        Q.  Okay.  So he has your left arm?

8        A.  Uh-huh.

9        Q.  Right?  And he trips you?

10       A.  He puts it behind my back and he trips me right

11   there in my doorway.

12       Q.  And then he gets on top of you?

13       A.  Put his knee in the middle of my back, and he

14   told me to put the phone down.

15       Q.  Okay.  Did you put it down?

16       A.  No, I didn't.

17       Q.  So he told you to put the phone down, but you

18   keep trying to face-time?

19       A.  Yes.

20       Q.  Did he tell you to give him the other arm?

21       A.  Yes.

22       Q.  And you kept trying to face-time?

23       A.  Yes.

24       Q.  Do you remember how many times he told you

25   that?

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 91

1      A.   No.

2      Q.   Okay.  And so at this point, are you facing the

3 doorway still?

4      A.   No.  Because he had spun me around, and we were

5 facing down the driveway.

6      Q.   Okay.  So when he grabbed your arm and tripped

7 you, he turned you around and you were facing back

8 towards the road?

9      A.   Towards the driveway, yeah.

10      Q.   And so --

11      A.   Right there in front of the door.  Maybe where

12 that door is there to where I'm sitting here, about that

13 far from the door.

14      Q.   Since we have a Court Reporter, how far --

15      A.   Seven or eight feet from the door.

16      Q.   Do you know what foot he trips you with?

17      A.   He -- I imagine his right because he wrapped it

18 around me.

19      Q.   Okay.

20      A.   I mean, when he wrapped me around, he twist my

21 arm and pushed me to the ground on both elbows.

22      Q.   So while you are on the ground, he got one arm

23 behind your back?

24      A.   A knee in my back, and trying to tell me --

25      Q.   Wait, stop.  Because I want to make sure I get

George Welch -- May 24, 2021

Page 92

1    the answers.  I think you just nodded your head then.

2                        So he got your left arm, right?

3         A.  Yes.

4         Q.  And he trips you and you go to the ground?

5         A.  Yes.

6         Q.  And you still have your phone in your right

7    hand?

8         A.  My right hand.

9         Q.  Trying to face-time?

10        A.  Yes.

11        Q.  And he tells you to give him that other arm and

12   give him the phone and you don't do that?

13        A.  I refused because I wanted somebody to witness

14   what was going on.

15        Q.  How many times did he tell you that?

16        A.  I'm not sure.  I don't recall.

17        Q.  Okay.

18        A.  But he did say give him the phone.

19        Q.  Okay.

20        A.  And give him my other arm.

21        Q.  And so when you didn't do that, that's when he

22   took the phone?

23        A.  Uh-uh. (Nods head up and down.)

24        Q.  Yes?

25        A.  Yes.

George Welch -- May 24, 2021

Page 93

1    Q.  Okay.  And he --

2    A.  He threw the phone down the driveway.

3    Q.  Threw the phone down the driveway.  Okay.  At

4  what point did he tase you?  Did you have your phone in

5  your hand when he tased you?

6    A.  I had the phone in my hand when he tased me.

7    Q.  And your understanding, how many times did he

8  tase you?

9    A.  It felt like three.

10   Q.  Okay.  Have you seen the Taser log that was

11  produced in this case?

12   A.  Yes.

13   Q.  Okay.  And would you agree with me that that

14  indicates that the trigger was pushed twice?

15   A.  But the -- I understand that the trigger was

16  pushed twice.  You can hold the trigger and  -- you can

17  look at the gun -- at the picture.  I got three marks on

18  my back, three different places.

19   Q.  Okay.  So you don't dispute that the Taser was

20  pulled twice?

21   A.  No, I don't dispute that, no.

22   Q.  Had you ever been tased before that?

23   A.  No.

24   Q.  Okay.  Do you know the difference between being

25  tased with like the actual prongs of a Taser and the

George Welch -- May 24, 2021

Page 94

1    phrase "dry stun"?  Do you know the difference in that?

2          A.  Uh-huh.  Yes.  One leaves marks, one don't.

3          Q.  Okay.  And what happened to you, you were

4    dry-stunned, right?

5          A.  No.  Because I got burns.

6          Q.  Okay.

7          A.  I got burns on my back.

8          Q.  Okay.  So your testimony is you were not

9    dry-stunned?

10         A.  No, not dry-stunned.  Dry-stunned does not

11   leave marks.

12         Q.  Okay.  So your testimony is that the actual

13   prongs of the Taser went in you?

14         A.  Yes.

15         Q.  Did they have to pull the prongs out of your

16   skin?

17         A.  No.  They didn't pull anything out of my skin,

18   but I was burned on three different spots on my back.

19         Q.  Okay.  And after you were tased, was he able to

20   get your other arm at that point?

21         A.  Yeah.  Yeah.

22         Q.  After he --

23         A.  Well, he was still tasing me.  He grabbed my

24   phone first and threw my phone down the driveway, okay?

25         Q.  Okay.

George Welch -- May 24, 2021

Page 95

1      A.   And then he grabbed my arm while he was tasing

2   me, put his knee on my back, and I'm thinking -- I don't

3   know how he did it, but this arm was behind my back.  He

4   had it --

5      Q.   Your left arm?

6      A.   Yeah.  My left arm was behind my back, and he

7   was grabbing this arm.  And all of that stuff happened

8   after he tased me.  He got my arm after he tased me.

9      Q.   And then he put you in cuffs?

10     A.   Yes.

11     Q.   And then who was the first officer to arrive on

12  the scene after you were in cuffs?

13     A.   I'm not sure.

14     Q.   Okay.  And you said all the other officers that

15  eventually arrived, they all came after you were already

16  in cuffs?

17     A.   Uh-huh.

18     Q.   Yes?

19     A.   Yes.

20     Q.   Were you still on the ground when any of the

21  officers came?

22     A.   Yes, I was, because it took two officers to

23  pick me up.  They picked me up by my arm.

24     Q.   Do you know which officers picked you up?

25     A.   I know Harris was one.

George Welch -- May 24, 2021

Page 96

1    Q.   Okay.   And another officer assisted him in

2    picking you up?

3    A.   Yes.

4    Q.   Where did they take you after they picked you

5    up?

6    A.   To the police car, Harris' police unit.

7    Q.   And did you stand on the outside, or did they

8    put you in it?

9    A.   They put me in it.

10    Q.   And you're still handcuffed?

11    A.   Yes.

12    Q.   And they put you in the back of the patrol car,

13    right?

14    A.   Yes.

15    Q.   Did you have any other conversations with any

16    of the other officers or --

17    A.   I talked with the Lieutenant.  He came to the

18    back of the patrol car and asked me a few questions.

19    And he said he needed to talk to the officers.  They

20    went and talked to Officer Harris.

21    Q.   What did he ask you when you were in the back

22    of the patrol car?

23    A.   Well, we knew each other from working out at

24    the jail.  And he said, let me handle this, and -- I

25    mean, Officer Scott, Lieutenant Scott, we worked out --

George Welch -- May 24, 2021

Page 97

1  I mean, we didn't actually work out together, but we saw

2  each other and spoke a couple of years.

3       Q.  So you and Lieutenant Scott --

4       A.  Knew each other.

5       Q.  You and Officer Harris didn't?

6       A.  No.  And he said, let me talk to the officer.

7       Q.  Okay.  And Lieutenant Harris was the one you

8  said was nice to you, right?

9       A.  Yeah.

10      Q.  And what conversation did you have with

11 Officer Harris, the arresting officer, once you're in

12 the back of the patrol car?

13      A.  He just, I had to show you.  You just won't

14 listen.  I had to show you.  I've got to show you.

15           And that's what he told Lieutenant Scott,

16 too, I got to show him.  I got to show him.

17      Q.  And did y'all have some conversation about

18 putting the dog back in your house?  Did your dog come

19 out of your house?

20      A.  Yeah.  The dog was out of my house.  I had -- I

21 told them I don't want my dog to get hit.  Because I had

22 opened the door.  When I was opening the door, that's

23 when Officer Harris grabbed me.  And my dog came out.

24      Q.  Okay.  And do you know who went and put your

25 dog back in the house?

George Welch -- May 24, 2021

Page 98

```
1       A.  No.

2       Q.  And did they lock your door back?

3       A.  What's that?

4       Q.  Did they lock your door?

5       A.  They went inside and got my wallet.  They went

6   inside.  I told them where my wallet was because they

7   wouldn't let me go inside.  I told them where the wallet

8   was.  One of the officers went in there and got my

9   wallet.

10      Q.  So you told them to get your wallet for you?

11      A.  Yeah.

12      Q.  Do you remember which one you told to go get

13  it?

14      A.  No.  I sure don't.

15      Q.  Where was it at in your house?

16      A.  In my bathroom, my master bedroom bathroom.

17      Q.  Did they lock your door for you, too?

18      A.  Yes, they did.

19      Q.  Did you ask them to do that, too?

20      A.  Yes, I did.

21      Q.  Did your -- did you have your glasses on that

22  day?

23      A.  Uh-huh.  (Nods head.)

24          MR. PERRY:  "Yes" or "no."

25      A.  Yes.  I'm sorry.  Yes, I had my glasses on.
```

George Welch -- May 24, 2021

Page 99

1    And, yes, my glasses were knocked off.

2        Q.  Okay.

3        A.  Another officer found my glasses under the

4    bushes on the left-hand side of the door.

5        Q.  Okay.  And did Officer Harris put your glasses

6    back on for you?

7        A.  Yes, he did.

8        Q.  Officer Harris?

9        A.  Yes, he did.

10       Q.  Which officer brought your cell phone back to

11   you?

12       A.  I'm not sure.

13       Q.  But somebody did, right?

14       A.  Somebody brought my cell phone to me because

15   Lieutenant Scott was talking to Officer Harris when they

16   -- when they --

17       Q.  So when Lieutenant Harris was talking to

18   Officer Harris --

19       A.  They went over to Lieutenant Scott's car and

20   talked.

21       Q.  And they were talking, and then one of the

22   other officers got your phone and brought it to you,

23   right?

24       A.  Uh-huh.  Yes.

25       Q.  All right.  Did any of the other officers --

George Welch -- May 24, 2021

1    You know, I don't want -- I don't want to be here.  I

2    don't believe in suing.

3        Q.  Uh-huh.

4        A.  I was done wrong.

5        Q.  Uh-huh.

6        A.  That's the only reason I am here.  If I wasn't

7    been done wrong, I would have paid the fines and kept

8    moving.

9        Q.  Did you do anything with the note?  Did you

10   give that to anybody or say anything to anybody?

11       A.  No.  Because I hadn't planned on doing this.

12       Q.  So Officer -- did Officer Harris drive you to

13   the police station?

14       A.  Yes, he did.

15       Q.  And were you booked in at the police station?

16       A.  Yes, I was.

17       Q.  Okay.  And were you bonded out at some point?

18       A.  Yes.

19       Q.  Who bonded you out?

20       A.  My daughter.

21       Q.  Okay.  How long were you there before she

22   bonded you out?

23       A.  About three hours.  Lieutenant Scott had called

24   the judge, and they had set bond before I even left the

25   house.

George Welch -- May 24, 2021

Page 104

1    Q.  Did you have to get any kind of medical
2  treatment after this incident?
3    A.  I didn't go.  I should have went because to
4  this day I'm still numb from the handcuffs right this
5  little section of my arm.  It's like a nerve is dead.  I
6  had Officer Harris to actually loosen the handcuffs up
7  because it had this whole thumb swollen for about two
8  days and I couldn't move it.
9    Q.  At some point you told Officer Harris the
10  handcuffs were too tight, right?
11    A.  Right.  And he loosened them.
12    Q.  And he loosened them.  Were you still at your
13  house?
14    A.  We were at the courthouse.  It was where he was
15  booking me at the courthouse.
16    Q.  Okay.  Did the -- did the Taser cause you any
17  injuries?
18    A.  It did, the burns on my back, yeah.
19    Q.  So there were burn marks on your back?
20    A.  Yes.
21    Q.  Okay.  Any other injuries other than the burn
22  marks on your back?
23    A.  The scars on my elbow from when I got tripped.
24    Q.  I'm talking about the Taser right now.
25    A.  No.

George Welch -- May 24, 2021

Page 105

1        Q.   So any other injuries from the Taser other than

2    burn marks on your back?

3        A.   No.

4        Q.   And how long did the burn marks stay there

5    before they went away?

6        A.   I'm not really sure.  It's something you don't

7    want to look at every day.

8        Q.   Well, I mean, do you know if it was weeks,

9    months, years?

10       A.   It didn't last years.  It was some weeks, I

11   know.

12       Q.   So a few weeks?

13       A.   Yeah.

14       Q.   What -- what other injuries did you have?  You

15   mentioned something on your elbows?

16       A.   Elbows, yeah.  Because when he tripped me, I

17   fell on my elbows on that asphalt, concrete, whatever

18   you want to call it.

19       Q.   And what kind of injury did you suffer to your

20   elbows?

21       A.   Scrapes.

22       Q.   On both of them or one, in particular?

23       A.   The left one, in particular.

24       Q.   Okay.  And how long did those scrapes last?

25       A.   Weeks.

George Welch -- May 24, 2021

Page 117

1      Q.  I'm not even talking about for Mercedes.  I'm
2  just talking about any person anywhere.  Have you told
3  anybody I got this lawsuit, I need you to be a witness
4  for me?
5      A.  No.  It's embarrassing enough to be arrested.
6      Q.  Do you have to have a tag for that -- for the
7  trailer, too?
8      A.  Yeah.
9      Q.  Were both of those up to date at the time of
10  the incident for the truck and trailer?
11      A.  Yes.
12      Q.  Okay.  Your license up to date at the time?
13      A.  Yes.
14      Q.  On the date of this incident where that trailer
15  was parked, that's a public road, right?
16      A.  Yes.
17      Q.  Mr. Welch, we are almost done.  Let me make
18  sure --
19      A.  Do your job.
20      Q.  -- I don't have anything else.  (Reviews.)
21          I know you mentioned earlier that you were
22  a diabetic, but do you have any other medical issues
23  that you are treated for besides that?
24      A.  No.
25      Q.  Okay.  Ever had any kind of surgeries on your

George Welch -- May 24, 2021

Page 119

1       A.  I know her first name is Yolanda.

2       Q.  Yolanda?  Where did you say she's located, what

3   city?

4       A.  She's between Dallas and Memphis.

5       Q.  Is she an accountant?

6       A.  She does one of the other transporter's taxes.

7       Q.  Does she have an office in Memphis?

8       A.  I don't know.

9       Q.  Okay.

10      A.  But it's -- she has a -- that's her number.

11      Q.  Okay.  I'm going to read that for the record.

12  Yolanda, 901- --

13      A.  901-219-4861.

14      Q.  4861?

15      A.  Uh-huh.  I'll show you everything that's --

16  2018, 2019, 2020 expense reports.

17      Q.  So that's what you submitted to her?

18      A.  No, sir.  It's in the process.

19      Q.  Okay.  Mr. Welch, you've been handed what we

20  marked Exhibit 5-A through 5-H to your deposition.

21  These were pictures that were produced to me in

22  discovery by your counsel.  So you've seen these before?

23      A.  Yeah.

24      Q.  Who took these pictures?

25      A.  I did.

George Welch -- May 24, 2021

Page 120

1      Q.  You took the pictures?

2      A.  Except the ones of my back.  My girlfriend took

3  the ones of my back, Beverly Harris.

4      Q.  What were they taken with, what kind of camera?

5      A.  IPhone.

6      Q.  Did you take any pictures of yourself regarding

7  this incident that were not produced?

8      A.  No.

9      Q.  So, in other words, every picture that you took

10  regarding this incident and your injuries are in this

11  stack?

12      A.  I don't see the elbow picture.  I see the two

13  forearm pictures.  I don't see the elbow picture.

14      Q.  You think there's an elbow picture, too?

15      A.  Yeah.

16      Q.  I don't know if I just missed it or if I

17  haven't seen it.

18      A.  It was like through here.

19      Q.  Uh-huh.

20      A.  See, it's actually still dark.

21      Q.  And let me -- for the record, the witness is

22  pointing at --

23      A.  It's still dark there where it was scraped at

24  Hernando.

25      Q.  Okay.  Let's just start at the first picture.

George Welch -- May 24, 2021

Page 121

1  Tell me what this shows, what this is.

2      A.  The wrist.

3      Q.  That's your wrist?

4      A.  (Nods head up and down.)

5      Q.  And that's a scratch on your wrist?

6      A.  That's where the thing was cutting into the

7  arm.

8      Q.  Okay.  That's the handcuffs -- 5-A represents

9  where the handcuffs were, right?

10     A.  Where it was cutting into that wrist.

11     Q.  Tell me what 5-B is.

12     A.  Taser mark on the back.

13     Q.  Okay.  And then 5-C, what is that?

14     A.  I think that's a duplicate.

15     Q.  Okay.  5-,D.  Tell me what that is.

16     A.  It's -- that's the bruises on this left wrist.

17     Q.  Okay.  Now, tell me, where did that come from?

18  Was that the handcuffs?

19     A.  (Nods head up and down.)

20     Q.  Is that "yes"?

21     A.  Yes.

22     Q.  And then 5-E, tell me what that is.

23     A.  That's the other set of where I got tased at

24  the other spot.

25     Q.  Okay.  Where exactly were you tased at?  And,

George Welch -- May 24, 2021

Page 122

1  just remember, we got the Court Reporter so just tell --

2       A.  Upper back and lower back.  He started lower

3  back and he moved up my back.

4       Q.  Okay.  And then tell me what 5-F is.

5       A.  That is my lower back.

6       Q.  Okay.  And then tell me what 5-G is.

7       A.  That's where he threw my phone down the

8  driveway.

9       Q.  Okay.  And the phone didn't break, did it?

10      A.  The screen saver broke, the phone case broke.

11      Q.  Okay.  So the damages to the phone were the

12  phone case and the screen protector, right?

13      A.  (Nods head.)

14      Q.  Is that "yes"?

15      A.  Yes.

16      Q.  The actual phone was not broke, correct?

17      A.  No.

18      Q.  Okay.  What kind of case did you have on this?

19      A.  I'm not sure.

20      Q.  Do you remember how much you paid for it?

21      A.  Oh, about $51.

22      Q.  $51?

23      A.  With the screen, with the glass.

24      Q.  Like an Otter Box or something?

25      A.  Yeah.

George Welch -- May 24, 2021

Page 123

1       Q.  Is that what that was?

2       A.  That's what I got on here now.  This was

3    something else.  Man, don't get me to lying.

4       Q.  Do you remember where you got it from?

5       A.  I got it at the store when I bought the phone.

6       Q.  Was that an AT&T store?

7       A.  Yes.

8       Q.  Where did you buy it from, what AT&T store?

9       A.  The one on -- it's the new one down in

10   Hernando, I think.

11      Q.  Okay.

12      A.  The new store down in Hernando.

13      Q.  Okay.  Did this -- was the screen protector

14   part of the case or was that separate?

15      A.  Separate.

16      Q.  How much was the screen protector, do you know?

17      A.  I think it was about -- I bought it at the

18   wrong place.  I thought it was $27 for that gorilla

19   glass.

20      Q.  Okay.  Is that what it was, it's called gorilla

21   glass?

22      A.  I think that's what they call it.

23      Q.  What -- all right.  Tell me what 5-H is.  Is

24   that part of the cell phone?

25      A.  That's the pieces you see missing.  I saw it in

George Welch -- May 24, 2021

Page 124

1   the driveway where he threw it down the driveway.

2        Q.  So 5-H is part of the cell phone case?

3        A.  Uh-huh.  I saw that a day later.

4        Q.  A day later?

5        A.  Yeah.  Because I seen he broke my case and I

6   jumped out of the truck and looked down on the ground

7   and it was on the ground.

8        Q.  I've also seen some other pictures that were

9   produced in the case by your counsel, and I don't think

10  there's any reason to make them an exhibit, but I think

11  all of them indicate other cars, maybe?

12       A.  Yes, sir.

13       Q.  Okay.  Who took these pictures?  Did you take

14  them or did counsel?

15       A.  No.  No.  I think, counsel.

16       Q.  Do you know anything about these pictures, when

17  they were taken or --

18       A.  I don't know when they were taken, but they

19  were presented at the County hearing.

20       Q.  They were presented in the criminal case?

21       A.  Yeah.

22       Q.  Okay.  Mr. Welch, I think we are almost done.

23  The last thing I'll ask you -- and I want you to talk to

24  your counsel for a minute.  And I am interested in that

25  police report that you mentioned where you said there

1         <u>CERTIFICATE OF COURT REPORTER</u>

2     I, KAREN CARNELL POPERNIK, MS CCR 1276,

3 TN LCR 469, Notary Public commissioned by the State

4 of Mississippi, do hereby certify that the foregoing

5 pages, and including this page, contain a true and

6 correct transcript of the testimony of the witness,

7 GEORGE WELCH, as taken by me at the time and place

8 heretofore stated, and later reduced to typewritten

9 form to the best of my skill and ability; that I

10 placed the witness under oath to truthfully answer

11 all questions in this matter by the authority vested

12 in me by the State of Mississippi and the State of

13 Tennessee; that the signature of the witness was

14 expressly not waived; and that I am not in the

15 employ of, or related to, any counsel or party in

16 this matter, and have no interest, monetary or

17 otherwise, in the final outcome of the proceeding.

18     Witness my signature and seal on this the

19 10th day of June, 2021.

20

21 _Karen Carnell Popernik_

22 KAREN CARNELL POPERNIK,

23 MS CCR 1276, TN LCR 469 (Exp. 7/1/22)

24 My Commission Expires: 3/5/24

25