Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MISSISSIPPI

OXFORD DIVISION


GEORGE WELCH                                        PLAINTIFF

V.                    CIVIL ACTION NO. 3:20-CV-00122-NBB-JMV

CITY OF HERNANDO, MISSISSIPPI, ET AL          DEFENDANTS



DEPOSITION OF GEORGE WELCH

Taken on Monday, May 24, 2021, at 9:33 a.m., in the

offices of Perry Griffin, PC, 5699 Getwell Road,

Suite G-5, Southaven, Mississippi 38672, at the instance

of the Defendants




Appearances Noted Herein




Reported by:

Karen C. Popernik, MS CCR 1276, TN LCR 469



REPORTING BY DANA, LLC
Post Office Box 1362
Brandon, Mississippi 39043
(601)-506-3440
DanaDMoulder@gmail.com

Exhibit "A"

George Welch -- May 24, 2021

Page 2

```
 1                      APPEARANCES:

 2    REPRESENTING THE PLAINTIFF:

 3         JOHN KEITH PERRY, ESQUIRE

 4         GARRET ESTES, ESQUIRE

 5         Perry Griffin, PC

 6         5699 Getwell Road, Building G-5

 7         Southaven, MS  38672

 8         662.536.6888

 9         Jkp@perrygriffin.com

10         Ge@perrygriffin.com

11

12

13    REPRESENTING THE DEFENDANTS:

14         G. TODD BUTLER, ESQUIRE

15         Phelps Dunbar LLP

16         4270 I-55 North

17         Jackson, MS  39211

18         601.352.2300

19         Todd.butler@phelps.com

20              Also Present:  Chief Scott Worsham

21

22

23

24

25
```

George Welch -- May 24, 2021

```
                                                    Page 11
 1   people that you would be related to in this area?

 2        A.  No.

 3        Q.  Okay.  No sisters, brothers, anything like that

 4   live in this area?

 5        A.  No.

 6        Q.  Okay.  What is your current address?

 7        A.  4228 Highway 309, Byhalia, Mississippi.

 8        Q.  And is that a home that you own or rent?

 9        A.  Rental.

10        Q.  Rental.  How long have you been there?

11        A.  About two years and two months.

12        Q.  Do you live alone there or does somebody else

13   live with you?

14        A.  Yes, I live alone.

15        Q.  Has anybody ever lived with you there?

16        A.  No.

17        Q.  Going back just before then, did you live at

18   the 1777 Trapper Drive address in Hernando?

19        A.  Yes, I did.

20        Q.  So that would have been directly prior to the

21   Byhalia address?

22        A.  Yes.

23        Q.  Okay.  How long did you live at the

24   1777 Trapper Drive address?

25        A.  From 2004 to 2018.
```

George Welch -- May 24, 2021

Page 28

1   going next.

2               Are you -- let's just start from now and

3   backwards.  Are you currently employed?

4       A.  Self-employed.

5       Q.  Okay.  And what is -- and you have your own

6   business, right?

7       A.  Yes.

8       Q.  What is the name of your business?

9       A.  Geo Transportation.

10      Q.  Geo Transportation?

11      A.  Uh-huh.

12      Q.  And how long have you had that business?

13      A.  Since 2016.

14      Q.  So from 2016 to present, have you worked

15  anywhere else or have you only been self-employed

16  through Geo Transportation?

17      A.  Only self-employed.

18      Q.  Tell me what Geo Transportation is.  What kind

19  of company is it and what do you do?

20      A.  Transport cars.

21      Q.  Okay.  For anybody.  In particular?  Do you

22  have contracts with different people?  Who do you

23  transport cars for?

24      A.  I have my own authority.  I can transport for

25  anybody.

George Welch -- May 24, 2021

Page 31

1  contracts with any particular dealerships?

2      A.  Audi and Acura.

3      Q.  Are those in Memphis or Mississippi or where?

4      A.  Memphis.

5      Q.  And how long have you had those contracts?

6      A.  Acura, probably a year.  Audi, probably two

7  years.

8      Q.  Okay.  What kind equipment does your -- do you

9  or your business own to perform this service?

10     A.  5500 dually, a 3500 dually, and a four-car

11 trailer.

12     Q.  Four-car trailer?

13     A.  I haul four cars at a time.

14     Q.  So do you have just one trailer?

15     A.  One trailer.

16     Q.  Okay.  How long have you had that trailer?

17     A.  Since 2017, this particular trailer.

18     Q.  Okay.  And so is that the only trailer you've

19 had from 2017 to the present?

20     A.  No.  I had a 40-foot flatbed that I sold in

21 2018.

22     Q.  In 2018?

23     A.  Uh-huh.

24     Q.  Okay.  Did you sell the flatbed before or after

25 the incident that we are here about today?

George Welch -- May 24, 2021

Page 32

1      A.   Before.

2      Q.   Okay.  So at the time that this incident

3   happened that we are here about today, the only trailer

4   you had was the four-car trailer?

5      A.   Uh-huh.  (Nods head.)

6      Q.   Okay.  And at the time of the incident we are

7   here about today, did you have the two duallies?

8      A.   No.  Just one.

9      Q.   One?  Okay.  And what kind of dually was it?

10     A.   A Dodge 3500.

11     Q.   Okay.  What year is it?

12     A.   2018.

13     Q.   Okay.  And the trailer and the truck, they were

14   both owned in the name of Geo Transportation, LLC?

15     A.   Uh-huh.  (Nods head.)

16     Q.   Do you have any employees, or is it just you?

17     A.   Just me.

18     Q.   Have you ever had any employees?

19     A.   No.

20     Q.   Ever had any -- anybody provide any work for

21   you at all, whether independent contractors or anything

22   like that?  Has it always been just you?

23     A.   As far as what?  Explain.

24     Q.   Well, some people might say, well, I don't have

25   any employees, but every now and then I'll hire Joe Blow

George Welch -- May 24, 2021

Page 33

1    to do something for me.  They are not my employee, but

2    he does some work for me.

3                    Have you ever had anybody like that, or is

4    it just you?

5         A.  No.  Just me.  Not hauling cars.  I had my

6    daughter add up my numbers, but as far as hauling cars,

7    no one hauled a car for me.

8         Q.  Okay.

9         A.  Too much liability.

10        Q.  I understand.  At the time of the incident that

11   we are here about today, did you have any contracts with

12   any dealerships at that time?

13        A.  Yeah.

14        Q.  Okay.

15        A.  Mercedes Benz of Collierville.

16        Q.  Collierville?

17        A.  Mercedes Benz of Collierville.

18        Q.  Did you have any other ones?

19        A.  Not at that time.

20        Q.  So at the time of the incident we are here

21   about, was Mercedes Benz of Collierville providing you a

22   hundred percent of your work?

23        A.  No.

24        Q.  Okay.  Where was the rest of the work coming

25   from?

George Welch -- May 24, 2021

Page 34

1    A.  Off of Central Dispatch.

2    Q.  So just to make sure I understand this, the

3    Central Dispatch deal, those aren't necessarily

4    contracts; those are just like one-off jobs here and

5    there.  Is that right?

6    A.  It's like -- Central Dispatch works as -- these

7    dealers are independents, put their cars on

8    Central Dispatch with a contact number, okay, with a

9    rate.  And you call and you agree on a rate up or down

10   from what they put on there, and we set up an individual

11   contract for each one.

12   Q.  So for an individual haul?

13   A.  Uh-huh.  (Nods head.)

14   Q.  So, basically, you have, as I appreciate it, at

15   the time of the incident we are here about -- and now

16   there's essentially two types of hauls that you do.

17   Sometimes you'd have contracts with dealerships where

18   you do consistent work?

19   A.  Uh-huh.

20   Q.  Is that correct?

21   A.  Yes.  They contract with dealerships -- to

22   understand contracts with dealerships, dealerships do

23   not put anything on Central Dispatch.  They call me

24   directly.

25   Q.  Okay.

George Welch -- May 24, 2021

Page 35

1    A.  And I am basically broker and hauler.  There's
2  no middleman.
3    Q.  Okay.  And then the Central Dispatch web site
4  that you're talking about, those are individual hauls?
5    A.  Yes.
6    Q.  You go in there and you essentially bid on
7  them?
8    A.  Uh-huh.  That's it.
9    Q.  Who is putting stuff on the Central Dispatch if
10  not dealers?  Is it just like individuals?
11    A.  You could go on there.
12    Q.  If I was trying to sell a car?
13    A.  You join Central Dispatch and you could put
14  anything you want to move.
15    Q.  Okay.  If somebody -- if I was to get on the
16  Internet and Google it, how would I find that website?
17  Would I say centraldispatch.com?
18    A.  That's it.
19    Q.  Okay.  Prior to having your own business in
20  2016, where did you work before that?
21    A.  UPS.
22    Q.  All right.  And as I understand it from your
23  discovery responses, I think you put maybe like 1992 to
24  2015.  Is that how long?
25    A.  Uh-huh.  (Nods head.)

George Welch -- May 24, 2021

1    do you have like a central business location, or is it

2    just your house address?

3        A.  At my address now.

4        Q.  Have you ever had an actual physical building

5    or central location?

6        A.  I used to park at Motor Scooter Cove, but now

7    one of the reasons I moved to Byhalia is for the space

8    to park equipment.

9        Q.  All right.  Tell me about Motor Scooter Cove.

10   What is that?

11       A.  That's in Nesbit, right there, down the same

12   street where the post office is at.  I used to park over

13   there.  I used to park over there at the -- the truck

14   line is CITI.

15       Q.  All right.  Tell me that again.  Now, there's a

16   -- there's a --

17       A.  There's a truck line there.

18       Q.  Okay.  And a truck liner is just --

19       A.  A truck line.  A trucking line, just like UPS,

20   FedEx.  It's a truck line.  The guy runs 37, 38 trucks,

21   I guess.  And I paid him to park in a spot.

22       Q.  Okay.  Do other people do that -- do that --

23   was it somebody -- when you say it's a truck line, is it

24   somebody that has their own business and --

25       A.  Yes.

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 38

```
1      Q.  -- they send -- they send trucks --

2      A.  Yes.

3      Q.  They just let you park there along with theirs?

4      A.  Yeah.  I mean, I paid for a spot.

5      Q.  And that's on Motor Scooter Cove?

6      A.  Motor Scooter Cove.

7      Q.  And that was in Southaven?

8      A.  Nesbit.

9      Q.  Nesbit.  Okay.

10             How long did you pay to park on

11   Motor Scooter Cove, from when to when?

12     A.  Hmmm.  Started in probably about March of '17.

13     Q.  Okay.

14     A.  Until I moved.

15     Q.  Until you moved to Byhalia?

16     A.  Uh-huh.

17     Q.  Which would have been what year?

18     A.  April of 2019.

19     Q.  And you just had a parking spot there, right?

20     A.  Uh-huh.  (Nods head.)

21     Q.  How far was Motor Scooter Cove where you parked

22   at from your house on Trapper Drive?  What distance is

23   that?

24     A.  Five miles.

25     Q.  Okay.  How much did you pay to park there?
```

George Welch -- May 24, 2021

Page 45

1    and you couldn't pick him out, why did you sue him?

2              MR. PERRY:  Object to the form.

3              You can answer if you can.

4    A.  Okay.  He was one of the officers.  It was two

5    officers, two cars full of officers.  Okay?

6    Q.  Uh-huh.

7    A.  One of them came up there -- actually the only

8    officer there that treated me with respect is the

9    Lieutenant.

10   Q.  Harris?

11   A.  Scott.

12   Q.  Scott?  Okay.

13   A.  Harris was the arresting officer.

14   Q.  I got you.

15   A.  Scott treated me with respect.  Everybody else

16   harassed me.

17   Q.  When you say "harassment", what do you mean by

18   that?

19   A.  "That's what you get.  That's what you did,"

20   stuff like that.  You've been parking the trailer there

21   forever, that kind of stuff.  But, actually, when we

22   called out on him and actually when he was calling out,

23   it was actually illegal and the judge proved that.

24   Q.  Okay.  All right.  You mentioned people saying

25   that you've had that parked there and them having to

George Welch -- May 24, 2021

Page 46

1    come out there.  Let's start with before the incident.

2              How many times before December 28, 2018,

3    had officers been over there about --

4         A.  December 23rd.

5         Q.  I'm sorry, December 23, 2018 -- had officers

6    been over there because of where your truck was parked?

7         A.  I'm not sure.

8         Q.  Okay.  Let me -- let's do this.  Let's make

9    this Exhibit 1 to your deposition.

10             (DISPATCH LOG MARKED AS EXHIBIT NO. 1.)

11        Q.  All right.  Prior to December 23, 2018,

12   officers had been over there about your truck being

13   parked on the road; you just don't remember how many

14   times.  Is that right?

15        A.  Uh-huh.  (Nods head up and down.)

16        Q.  What I've handed you right now is a dispatch

17   log from the Hernando Police Department, and if you will

18   just take a look at it, you see the columns at the top?

19        A.  Uh-huh.

20        Q.  See there's a dispatch number and there's

21   agency and just keep going on and it says location and

22   incident report number and all that?  You see those

23   different columns?

24        A.  Uh-huh.

25        Q.  Down on the location column, you see each one

George Welch -- May 24, 2021

Page 47

1      of those entries say 1777 Trapper Drive.

2                  You see that?

3      A.   Uh-huh.

4      Q.   And that's your address, right?

5      A.   That's it.

6      Q.   Just take a look at this for me and you'll see

7      the dispatch dates and the officer and all of that.   I

8      want to see if this refreshes your recollection, at

9      least about some of the times the officers had been over

10     there.

11                 So take a moment to look at it and we'll

12     talk about it.

13     A.   (Reviews.)   The other thing, too, they got me

14     listed as calling here, and that's not my phone number.

15     The very last one, that's actually Wayne Perkins'

16     number.

17     Q.   Okay.

18     A.   So this report, the two last ones are wrong

19     because I never called.   I called to ask about a ticket

20     because they put a ticket on my window.   And see where

21     it say "Information," why I called, that was somebody

22     put a ticket on my window that day.

23     Q.   Which one are you talking about?

24     A.   Next to the last one.

25     Q.   Next to the last one.   Okay.

George Welch -- May 24, 2021

Page 48

```
1        A.   See, I was calling for information.
2        Q.   So you're looking -- just to make sure we are
3   clear for this transcript here, you're talking about the
4   one from March 22, 2017, right?
5        A.   Yes.
6        Q.   And it says, "Caller, George Welch," and then
7   it has 901-598-9333?
8        A.   Uh-huh.  That's my number.
9        Q.   That's your phone number, right?
10       A.   Uh-huh.
11       Q.   You called on that incident, right?
12       A.   Yes.  That's for information on a ticket they
13  put on my windshield.
14       Q.   What was the ticket for?
15       A.   Parking.
16       Q.   Okay.  And do you know, was it this patrolman,
17  Perry Thornton, that wrote the ticket?
18       A.   I don't know.  He just left it on the
19  windshield, and I was out of town when it happened.
20       Q.   Okay.  What did the -- what was -- it was just
21  a parking ticket?
22       A.   Uh-huh.
23       Q.   Okay.  And what did you -- who did you talk to
24  when you called?
25       A.   I'm not sure.  I just called the Hernando City
```

George Welch -- May 24, 2021

Page 49

1    and asked where I needed to pay the ticket.

2         Q.  Did you pay the ticket?

3         A.  Yes, I did.

4         Q.  How much was it?

5         A.  I want to say it was 125.

6         Q.  125?

7         A.  Uh-huh.

8         Q.  Okay.  And was your vehicle parked on

9    approximately the same place then that it was on the

10   date of this incident?

11        A.  No.  No.

12        Q.  Okay.  Where was it parked then when you got

13   that ticket?

14        A.  On Carlee.  Carlee and Trooper joins.  It was

15   on the Carlee side of the street, on the side of my

16   house instead of the front.  I live on a corner lot.

17        Q.  And then you said there's a mistake on this

18   log.  You said the last one that would have been on

19   here, 3/21/2017, which, I guess, would be technically

20   the first one.  It's got your name as the caller, and

21   then it's got 901-239-6789.  But we said that's actually

22   Wayne Perkins' number, right?

23        A.  Yes.  That's the one he called on the other

24   ones.

25        Q.  All right.  Okay.  Let's start with that one.

George Welch -- May 24, 2021

Page 50

1   Do you recall that on March 21, 2017?

2       A.  I don't recall.  The only ones I recall really

3   date-wise are the last two.

4       Q.  Okay.  And so it says March 21, 2017, and you

5   said that was Wayne Perkins that called, and then we see

6   it says Call Type, and it says Parking Violation.

7               Do you see that?

8       A.  Uh-huh.  (Nods head up and down.)

9       Q.  So that would have been whenever you -- the

10  ticket was left on your windshield, right?

11      A.  The 22nd, yeah.  I mean, the 21st.

12      Q.  Well, it's got the 21st and then it says you

13  called on the 22nd.  Are those dates accurate?  Is that

14  how it went down?  The ticket was left on the 21st and

15  then you found it and called about it on the 22nd?

16      A.  Yes.

17      Q.  All right.  Then let's go up to the next one.

18  There's one on 3/29/2017.  And it again it says Wayne

19  Perkins called.  You see that?

20      A.  Yeah, I guess so.

21      Q.  Okay.  And then it says the officer listed is

22  Brian Bell.

23              Did they come out to your house on that

24  date?

25      A.  I'm not sure.  I mean, they came to the house,

George Welch -- May 24, 2021

Page 51

1    I'm not sure if they came or I was gone or whatever.

2        Q.  Prior to December 23, 2018, is this March 21st

3    occasion, is that the only other time that you had

4    received a ticket for the parking?

5        A.  Yes.

6        Q.  Okay.  But there had been other occasions where

7    they actually came out to your house that they didn't

8    give you a ticket, right?

9        A.  Yes.

10       Q.  They told you to move the vehicle?

11       A.  Yes.

12       Q.  And did you move it?

13       A.  Yes.

14       Q.  Okay.

15       A.  I moved the vehicle because of courtesy.

16   Because I'm not a member of the homeowners association.

17   They had already -- they said in one of the reports that

18   I wasn't required to move the vehicle because I wasn't

19   doing anything illegal.  I did it for courtesy, and even

20   the judge said it was not illegal.

21       Q.  Yeah.  I understand about the criminal

22   proceeding.  Tell me about the homeowners association.

23   What are you saying about that?

24       A.  I'm not a member of the homeowner association.

25   I was there before the homeowners association.  I had

George Welch -- May 24, 2021

Page 52

1   been there that long.  I think I was the fifth person

2   that moved in the neighborhood.  We didn't have a

3   homeowners association.

4       Q.  So you were not required to join the

5   homeowners association?

6       A.  Yeah.  That's if you do anything -- I was

7   grandfathered in before the homeowners association.  It

8   was nine houses in the neighborhood that was not a

9   member of the homeowners association because we were

10  grandfathered in before they had one.  And it was our

11  choice to join it or not.

12      Q.  What is the name of the homeowners association?

13      A.  I don't know.

14      Q.  Okay.  Let me ask you this.  I know the address

15  is Trapper Drive, but is there -- is that --

16      A.  The subdivision is Forest Meadows.

17      Q.  Forest what?

18      A.  Meadows.

19      Q.  Forest Meadows?

20      A.  Uh-huh.  But I don't know the name of the

21  homeowners association.

22      Q.  I guess what I'm saying is what does the

23  homeowners association have to do with the parking

24  situation?  Help me with that.

25      A.  I don't know.  I'm not a member.  I don't know

George Welch -- May 24, 2021

Page 53

1   the bylaws.

2       Q.  So you don't know whether the

3   homeowners association rules say one way or the other

4   anything about parking; is that right?

5       A.  They apparently did because that's what they

6   said I was doing was violating the homeowners

7   association.

8       Q.  That's your understanding of what Wayne Perkins

9   was complaining about?

10      A.  Uh-huh.

11      Q.  Okay.  So it's your understanding he was

12  calling the cops saying, he's violating the homeowners

13  association?

14      A.  Yes.

15      Q.  Okay.  And your response to that is, I'm not a

16  member of the homeowners association and --

17      A.  I moved my vehicle for courtesy.

18      Q.  Okay.  Okay.

19      A.  And the vehicle was never there over a 12-hour

20  period any time.  I could pull up to get my lunch box

21  and the police would be out there before I could move.

22      Q.  Did that residence have a driveway?

23      A.  Yes.

24      Q.  Okay.  Would the truck and trailer not fit in

25  the driveway, or why was it parked on the street to

George Welch -- May 24, 2021

Page 54

1   begin with?

2       A.  Ease of convenience.  It was just hard to back

3   that trailer up in that drive.

4       Q.  Okay.  You said on this ticket that you

5   received on March 22, 2017, that it was parked on the

6   side of the street.  What was the name of the street it

7   was parked on?

8       A.  Carlee.  C-a-r-l-e-e.

9       Q.  Was it in front of somebody's house or --

10      A.  No.  On my side of the street.

11      Q.  Okay.  On the date of the incident we are here

12  about, where was it parked?

13      A.  In front of my house on Trapper Drive.

14      Q.  Okay.  Any reason about the change of location

15  or just sometimes you parked on the side, sometimes you

16  parked directly in front of your house?  Is there any

17  reason it was in different locations?

18      A.  It was easier on the front side of the house

19  and I could see out the window.  Sometimes I would have

20  250-, $300,000 worth of cars on it.  I couldn't see them

21  outside of the house.

22      Q.  So where you had it parked on the date of the

23  incident we are here about, that was more convenient to

24  you?

25      A.  Yeah.  I could see the vehicles.

George Welch -- May 24, 2021

Page 55

1      Q.  On the other -- on the other occasions where
2  the police came to your house and asked you to move the
3  vehicle and you said you moved it just out of courtesy,
4  was it always parked in the same location in front of
5  your house?
6      A.  Uh-huh.  (Nods head up and down.)
7      Q.  Is that a "yes"?
8      A.  Yes.  I'm sorry.
9      Q.  So the ordinary place you would park it at was
10  in front of your house and not on the side of the
11  street?
12     A.  Yes.
13     Q.  Okay.  Approximately how many times would you
14  say that the police officers came over there and told
15  you to move it and you moved it because of a courtesy?
16  How many times did that happen?
17     A.  Hmmm.  Eight, ten.
18     Q.  Eight or ten?
19     A.  Uh-huh.
20     Q.  Why did you keep parking there if they kept
21  coming over there telling you to move it?  Why did you
22  keep doing it?
23     A.  One, it was depending on what time of the night
24  I would get home.  Two, if somebody had my parking spot
25  at Motor Scooter Cove, I would just drive home.

George Welch -- May 24, 2021

Page 56

1    Q.  Okay.  Let me ask you that.  Why would somebody
2    ever have your parking spot if you were paying the guy
3    $100 a month?
4              MR. PERRY:  Object to the form.  Wait a
5    minute until I object.
6              Go ahead and you can answer.
7    A.  The -- a lot of times -- he owns a fleet, okay?
8    Q.  Uh-huh.
9    A.  And where I park at, see, if he get a new
10   driver or anything of that incident, they may park in my
11   spot that's dedicated to me.
12   Q.  Okay.  And then you said sometimes it was just
13   too late to go there because of how late it was at
14   night, and you just parked on the street?
15   A.  The reason being like on the weekend, and if I
16   didn't get to Motor Scooter Cove on the time of the
17   weekend, someone would always take my spot because his
18   drivers would come in and be out all week.  They come in
19   and be out all week and they park where it's convenient
20   for them.
21   Q.  So any time that you had it parked on the
22   street, it always was because somebody had your spot at
23   where you were paying?
24   A.  Pretty much, uh-huh.  Yes.  And, like I said,
25   it's not illegal to park on that spot, and I was just

George Welch -- May 24, 2021

Page 57

1    doing it for courtesy.  And the other reason is he had

2    security cameras over there where I was parking.  That's

3    one reason I parked there, for the security cams.

4         Q.  At the place where you pay the money?

5         A.  Uh-huh.  (Nods head up and down.)

6         Q.  If you -- I know you said it wasn't illegal.

7    Why did you pay the $125 ticket if you didn't think it

8    was illegal?

9         A.  Just to stop the hassle.

10        Q.  Okay.

11        A.  Any day I lease in Cordova or Hernando, I lose

12   money.

13        Q.  Meaning because you could be out working making

14   money?

15        A.  Yeah.

16        Q.  Okay.  Look back at that sheet for me on

17   Exhibit 1.  If you go up, you see the one on June 13,

18   2018, and June 18, 2018?  They both say Parking

19   Violation.

20             Do you see that?

21        A.  Uh-huh.

22        Q.  Okay.  Your testimony is that you don't

23   remember receiving a ticket on those occasions; you

24   think that they just came out and told you to move it.

25   Is that right?

George Welch -- May 24, 2021

Page 58

1    A.  Yeah.

2    Q.  Okay.

3    A.  I don't think I got a ticket.  I only remember

4  one ticket other than -- that one ticket that they put

5  on the windshield, and then I got ticketed the day I got

6  arrested.

7            MR. PERRY:  On your last question he

8  answered "uh-huh."  And I just want to -- the only

9  reason I'm saying this, I don't want to interrupt your

10  deposition, but from now on, you got to answer "yes" or

11  "no."

12            THE WITNESS:  I'm sorry.  I apologize.

13            MR. PERRY:  No.  I apologize.  Y'all move

14  so fast.

15            MR. BUTLER:  I appreciate that.

16            MR. PERRY:  Yes, sir.

17    Q.  I know you said that the trailer was a four-car

18  trailer; is that right?

19    A.  Yes.

20    Q.  Do you have any idea what the dimensions of it

21  are?  How big is it?

22    A.  Not really.

23    Q.  Okay.  Any idea about what approximate foot,

24  like how many foot trailer?

25    A.  40.

George Welch -- May 24, 2021

Page 59

1     Q.  40-foot.  Okay.

2     A.  It's not as wide as the dually truck.  It's not

3  as wide as the truck, I can tell you that.  It's

4  narrower than the truck.

5     Q.  I think weve got some pictures, too.  We'll

6  look at those here shortly.

7          Did you ever talk to the guy you were

8  renting the spot from about, you know, your parking spot

9  being used?  Did you ever say, hey, man, I'm paying

10  money --

11     A.  Yeah, I called him that night.  He said

12  whatever trailer was there, when his mechanic got there,

13  he'd have him move so I could go park.

14     Q.  All right.  I know this happened on

15  December 23, 2018.  And that was -- it happened in the

16  morningtime, right, this incident we are here about?

17     A.  Yes.

18     Q.  Had the officers been there the night before to

19  your house?

20     A.  Yes.

21     Q.  Okay.  Which officer came the night before?

22     A.  I want to say his name is Bell?

23     Q.  Officer Bell?  What time did he come the night

24  before?

25     A.  Hmmm.  10:30, 11 o'clock.

George Welch -- May 24, 2021

Page 60

1      Q.  10:30 or 11 o'clock p.m.?

2      A.  Uh-huh.

3      Q.  And that would have been on December 22nd?

4      A.  Uh-huh.

5      Q.  Okay.  And what did he tell you when he came?

6      A.  He just -- I mean, he said, I got a complaint,

7  and this is -- they tell me the lady called.  They

8  always say, the lady called, the lady called, and it's

9  actually a man calling, and that, you parked in

10  violation of the parking space, I mean, the parking

11  rules.

12      Q.  And what did you respond?

13      A.  That I had already called because I went to the

14  place where I normally park at.  My spot wasn't there so

15  I just drove to the house.

16      Q.  Okay.  That night, though, you didn't move it.

17  You told them you were going to move it in the morning;

18  is that right?

19      A.  Uh-huh.  As soon as Nate called me to tell me

20  my parking spot was open, I was going to move the truck.

21      Q.  Okay.

22      A.  Because I called -- when I got there and my

23  spot was not there, I called Nate that evening around

24  about 6:30, 7 o'clock.  And he said, when we get in

25  there in the morning to work, we'll move it out of your

George Welch -- May 24, 2021

Page 61

1    spot.  Because I was running on a Sunday.  We'll move it

2    out of the spot where you can get --

3         Q.  Okay.  December 23, 2018, when this happened,

4    what day of the week was that?

5         A.  The 23rd was a Sunday.  I was running that

6    Saturday and came in that Saturday evening.  I normally

7    don't run on weekends.

8         Q.  Okay.  Just want to make sure I got it right.

9    So on Saturday, December 22nd --

10        A.  Is when I came back into town.

11        Q.  You came back into town around 5:00, 6:00,

12   7:00 p.m. right?

13        A.  It was dark.  I remember it was dark when I got

14   there and my spot was took.  I called Nate, and when I

15   called Nate, he said as soon as they get in the next

16   day, they would move the tractor-trailer out of my spot.

17        Q.  All right.  So you had that conversation with

18   Nate?

19        A.  Uh-huh.

20        Q.  And later on that night, Officer Bell comes

21   around 10, 10:30, 11 p.m., right?

22        A.  Yes.

23        Q.  And he says, we got a complaint about your

24   parking?  Is that right?

25        A.  Yes.

George Welch -- May 24, 2021

Page 62

1    Q.  And you said he said it was from a woman?

2    A.  That's what they've told me every time they

3  come there.

4    Q.  Okay.

5    A.  That the lady called again, that -- every

6  police officer that came there has told me it's been a

7  woman called.

8    Q.  And what is your understanding of who you think

9  actually called?

10    A.  I know now who actually called.  I thought it

11  was the woman from the side that was calling.

12    Q.  What is her name?

13    A.  I don't know.

14    Q.  Okay.  Who is Wayne Perkins?  Where does he

15  live?

16    A.  Two doors -- if you are facing my house, two

17  doors up the hill, east of me.

18    Q.  Is he married?

19    A.  Yes.

20    Q.  What is his wife's name, do you know?

21    A.  I don't know.  He has a problem with everybody

22  in the neighborhood.

23    Q.  Okay.  I know the type.  All right.

24        So Officer Bell comes somewhere between 10

25  and 11:00 p.m.?

George Welch -- May 24, 2021

Page 63

1      A.  I think that's his name.  I'm not sure of the

2  name.

3      Q.  Okay.  An officer comes out there and says, we

4  got a complaint, right?

5      A.  Yeah.

6      Q.  And you told them, I'm going to move it in the

7  morning?

8      A.  Yes.

9      Q.  Did you tell them --

10     A.  I said as soon as I get a call in my parking

11  spot.  He was very courteous.  The officer was very

12  courteous.

13     Q.  Did you tell Officer Bell that you were going

14  to have it moved by 7:00 a.m.?

15     A.  No.

16     Q.  Did you ever tell anybody you were going to

17  have it moved by 7:00 a.m. on the 23rd?

18     A.  I told them when I got the call to move it.

19     Q.  What time did you --

20     A.  I said, first thing in the morning when I get

21  the call.

22     Q.  Okay.  You just said, first thing in the

23  morning?

24     A.  Yeah, because I don't know what time these guys

25  get to work.

George Welch -- May 24, 2021

Page 66

1   morning of December 23rd?

2       A.  Not offhand.  I know I was awoke when

3   Officer Harris got there.

4       Q.  Okay.  What were you doing when you saw him

5   pull up?

6       A.  What's that?  I was in the house doing routine

7   stuff.  Tending to my dog and all that.

8       Q.  Were you up, dressed, eating breakfast?

9       A.  Yeah.

10      Q.  Okay.  Where did he park at?

11      A.  The west side of my yard below the mailbox.

12      Q.  Okay.  And this is Officer Harris, right?

13      A.  Uh-huh.  (Nods head up and down.)

14      Q.  So he parked on the street?

15      A.  Uh-huh.

16      Q.  And walked up to your driveway?

17      A.  Uh-huh.

18      Q.  And then knocked on your door?

19      A.  Yeah.  I greeted him at the door so he never

20  knocked.

21      Q.  Okay.  Before we get to that, give me generally

22  what -- give me a description just of the outside of the

23  home.  Is it just a house with a yard and a driveway?

24  What does it look like from the outside?

25      A.  House, driveway.  Maybe three-car deep

George Welch -- May 24, 2021

Page 68

```
 1        A.  And trailer.

 2        Q.  -- trailer was parked on the side of the street

 3   in front of the house?

 4        A.  Uh-huh.

 5        Q.  Yes?

 6        A.  Yes.  Yes.

 7        Q.  Look, I'm the world's worst about it.

 8        A.  I'll apologize a hundred more times.

 9        Q.  No need to apologize.  Just don't get mad at us

10   when we remind you.

11        A.  That's your job, man.

12        Q.  Okay.  You said that you -- that he never had

13   to knock because you met him.  Did you walk all the way

14   outside?

15        A.  I walked outside.  He was walking across the

16   yard towards the driveway.

17        Q.  Is there like a porch on the house, or do you

18   just go directly out into the yard?

19        A.  Just a little covering.  That's all.  It covers

20   a step as long as this table is across.

21        Q.  Did you meet him in the grass or driveway?

22        A.  Met him in the driveway.

23        A.  Uh-huh.

24        Q.  Just a concrete driveway?

25        A.  Yeah.
```

George Welch -- May 24, 2021

Page 77

1      A.   Uh-huh.

2      Q.   About halfway down the driveway?

3      A.   Yeah.

4      Q.   Okay.  Tell me what happened from there.

5      A.   He said, you know what I'm here for.  I said,

6  yes, because my blankity-blank-blank neighbors.  I said,

7  it's the lady, because that's all I've been told is a

8  lady that's been calling, called y'all again.  I said, I

9  told the officer last night I would move as soon as they

10  called and tell me my parking spot was open.

11      Q.   Okay.  And I know you said blankety-blank, but

12  for the record, tell me, do you remember what you said?

13      A.   I know I called -- said the "bitch" word.

14      Q.   Okay.

15      A.   "These bitches had called again", and, you

16  know...

17      Q.   Okay.  Is it fair to say you were frustrated

18  with your neighbors calling all the time?

19      A.   Yeah.  Because the thing is, like I said, it's

20  been to court, it wasn't illegal.  Nothing I did was

21  illegal.  So I was being harassed.

22      Q.   At the time -- you had never been to court at

23  that time, right?

24      A.   I hadn't been to court, but in the report one

25  of the police officers even told me that there was

George Welch -- May 24, 2021

Page 80

1    Q.  I don't want to hold up our progress because I
2  don't think we've got too much longer and I want to keep
3  going, but when we take a break in a minute, I'm going
4  to ask that you get with your counsel and I want to make
5  sure I see that police report that you're talking about
6  because we may need to talk about that.  Okay?
7    A.  Okay.
8    Q.  Okay.  So you said the officers asked you, do
9  you know what I'm here about, and you said, yeah,
10  neighbors, you know, something to the effect of these
11  bitches calling again, something like that.
12              Is that fair?
13    A.  Yes.
14    Q.  What did he respond with after that?
15    A.  That -- that it was a safety issue with me
16  parking on the side of the street.
17    Q.  And did he tell you to -- did he tell you to
18  move the car?
19    A.  Yes.
20    Q.  And what did you say?
21    A.  I was going to the truck because I had my keys
22  in my pocket.  I was going to the truck to move it.  And
23  he said, I need to see your license.  I said, what do
24  you need to see my license for?  And he said, I need to
25  see your license.  And that's where we get to -- but I

George Welch -- May 24, 2021

                                                    Page 81

1    didn't have my wallet on me.  When I realized I didn't

2    have my wallet on me, I was walking back to the house --

3         Q.  Let me stop you real quick.  So in the

4    Complaint or somewhere I read, I think, it says

5    something to the effect of --

6         A.  I don't have to show him the license.

7         Q.  "I don't have to give you shit."  Was that the

8    statement?

9         A.  That is an exaggerated lie.

10        Q.  Tell me what the actual statement was.

11        A.  The actual statement was, "I don't have to show

12   you my license."

13        Q.  Okay.  Hold on a second.

14        A.  I did not direct any cuss words toward him.

15        Q.  Okay.

16        A.  I directed cuss words toward my neighbors, but

17   I did not direct it to the officer.

18        Q.  I understand.

19        A.  He was upset because --

20             MR. PERRY:  Wait until he asks you a

21   question.

22        A.  I'm sorry.  And let's take a break right now.

23             (Break in the deposition.)

24   CONTINUING:

25        Q.  (Mr. Butler:)  Mr. Welch, we are back on the

George Welch -- May 24, 2021

Page 85

1   particular?

2        A.  No.

3        Q.  I told you at the beginning, part of this is

4   trying to see what you remember and what you don't.

5   There's no right answer.  I just want to know what you

6   know.

7        A.  It's been about three years ago.

8        Q.  So you indicate to him that you don't have to

9   give him your license, right?

10       A.  Yes, I did.

11       Q.  Okay.  What is the next thing that happens

12  after that?  Is that when he tried to arrest you?

13       A.  No.  Because I didn't have my wallet.  When I

14  went to my truck, I said, I ain't got my wallet.  In my

15  mind I said, if I drive off without my wallet, I'm

16  definitely in trouble.  I walked back towards the house.

17       Q.  Okay.  But you didn't tell him, I'm walking

18  towards my house --

19       A.  Yes, I did.  I did tell him, I said, I don't

20  have my license on me.

21       Q.  Okay.

22       A.  And when I realized I didn't have my license on

23  me, I said I didn't have my license on me.  I did tell

24  him that.

25       Q.  Okay.  I just wanted you to help me with the

George Welch -- May 24, 2021

Page 86

1   sequence.  So originally you told him words to the

2   effect of, I don't have to give you my license?

3       A.  That's right.

4       Q.  Okay.  But then you turned around and you

5   started walking to the house to get your license?

6       A.  Yes, because I didn't have them.

7       Q.  And you just said, I don't --

8       A.  I was going to move my truck.  I got to go get

9   my license to get in my truck.  My license in my wallet.

10  And after they arrested me --

11      Q.  Slow down.  I want to make sure we go in order.

12  So originally you are walking towards --

13      A.  The truck.

14      Q.  So you do have your keys on you?

15      A.  I got my keys.

16      Q.  But you don't have your wallet?

17      A.  Don't have my wallet.

18      Q.  And so you're walking towards the truck with

19  the indication of moving the truck?

20      A.  Yeah.

21      Q.  He asked for your license?

22      A.  License.

23      Q.  And you tell him, I don't have to give it to

24  you?

25      A.  I don't.  I didn't.

George Welch -- May 24, 2021

```
                                                        Page 87
 1        Q.   Okay.  And I'm not -- I just want to know
 2   factually what happened.
 3             All right.  So you told him you didn't have
 4   to give him your license?
 5        A.   That's right.
 6        Q.   But then you turned around and start walking
 7   towards your house, right?
 8        A.   Correct.
 9        Q.   And did you say anything when you were walking
10   toward the house, or were you walking, saying, well, I
11   don't have to give it to him, but I'm going to get it?
12   What was going on there?
13        A.   I don't have to give it to him, but I do have
14   to have my license to drive my truck away from my house.
15        Q.   So that's why you were turning around to go in
16   your house?
17        A.   Yes.
18        Q.   And did you say anything to him or did you
19   just --
20        A.   I told him.  I told him, I said, I don't have
21   my license on me.  When he said that, he said, I need
22   you to get your license.  And I said, I ain't even got
23   my license on me.
24        Q.   Okay.
25        A.   So I was walking to my house through the yard.
```

George Welch -- May 24, 2021

Page 88

1      Q.  Okay.

2      A.  And he was following me.  And when I got to the

3   door of the house and opened the door of the house,

4   that's when he grabbed my arm, put it behind my back,

5   took his foot and tripped me on the concrete.  At that

6   time I had my phone in my hand, trying to face-time to

7   get somebody to witness what was going on.

8      Q.  Okay.

9      A.  Beverly Harris did not answer the phone.

10     Q.  Okay.

11     A.  Okay.  He took my phone.  He tased me in the

12  back.  Like I was holding my phone like this.  Give me

13  the other hand because he had this hand in handcuffs.

14  I'm trying to face-time.  He tased me in my back.  He

15  finally takes my phone out of my hands because I was

16  holding it trying to make a call.  And he takes my phone

17  and throws it down the driveway and busts the case and

18  the lens on my phone, the what-you-call-it on my phone.

19     Q.  Let me break that down a little bit.

20          All right.  So I thought the whole arrest

21  interaction happened -- did it happen in the driveway

22  or --

23     A.  It happened in my doorway.

24     Q.  Okay.  In the doorway?

25     A.  In the doorway of my home, because I hit -- my

George Welch -- May 24, 2021

Page 89

1   door was pushed down like this.  When I pushed the door

2   back, he grabbed this arm.

3       Q.  Okay.  Okay.  Hold on.  Hold on.  Tell me about

4   the handle on your door.  Is it like a round doorknob

5   or --

6       A.  The kind you just push down.

7       Q.  And so you, when you reached for the --

8       A.  To push it down.  I had pushed it down and

9   opened the door because he let my dog out.

10      Q.  Okay.  And then he grabbed which arm?

11      A.  My right arm -- I mean, my left arm, because I

12  had my right arm.  That's the one he had behind my back

13  with the handcuff and his knee in my back.

14      Q.  So you reached for the doorknob with which

15  hand?

16      A.  Right hand.

17      Q.  Right hand.

18      A.  And he grabbed my left hand.

19      Q.  Where is the phone at at this point?

20      A.  In my right hand.

21      Q.  In the same hand that you're going to do the

22  door?

23      A.  Uh-huh.

24      Q.  Had you already started dialing though?

25      A.  I dialed.  I had face-timed Beverly Harris.

George Welch -- May 24, 2021

Page 90

1    It's my iPhone.

2         Q.  So it's ringing at the same time in the same

3    hand that you're pressing the door, right?

4         A.  Yeah.  And when the phone start ringing, it

5    just seemed like that was his cue that he didn't want it

6    to happen.

7         Q.  Okay.  So he has your left arm?

8         A.  Uh-huh.

9         Q.  Right?  And he trips you?

10        A.  He puts it behind my back and he trips me right

11   there in my doorway.

12        Q.  And then he gets on top of you?

13        A.  Put his knee in the middle of my back, and he

14   told me to put the phone down.

15        Q.  Okay.  Did you put it down?

16        A.  No, I didn't.

17        Q.  So he told you to put the phone down, but you

18   keep trying to face-time?

19        A.  Yes.

20        Q.  Did he tell you to give him the other arm?

21        A.  Yes.

22        Q.  And you kept trying to face-time?

23        A.  Yes.

24        Q.  Do you remember how many times he told you

25   that?

George Welch -- May 24, 2021

```
                                                   Page 91
 1       A.   No.

 2       Q.   Okay.  And so at this point, are you facing the

 3   doorway still?

 4       A.   No.  Because he had spun me around, and we were

 5   facing down the driveway.

 6       Q.   Okay.  So when he grabbed your arm and tripped

 7   you, he turned you around and you were facing back

 8   towards the road?

 9       A.   Towards the driveway, yeah.

10       Q.   And so --

11       A.   Right there in front of the door.  Maybe where

12   that door is there to where I'm sitting here, about that

13   far from the door.

14       Q.   Since we have a Court Reporter, how far --

15       A.   Seven or eight feet from the door.

16       Q.   Do you know what foot he trips you with?

17       A.   He -- I imagine his right because he wrapped it

18   around me.

19       Q.   Okay.

20       A.   I mean, when he wrapped me around, he twist my

21   arm and pushed me to the ground on both elbows.

22       Q.   So while you are on the ground, he got one arm

23   behind your back?

24       A.   A knee in my back, and trying to tell me --

25       Q.   Wait, stop.  Because I want to make sure I get
```

George Welch -- May 24, 2021

Page 92

1    the answers.  I think you just nodded your head then.
2              So he got your left arm, right?
3        A.   Yes.
4        Q.   And he trips you and you go to the ground?
5        A.   Yes.
6        Q.   And you still have your phone in your right
7    hand?
8        A.   My right hand.
9        Q.   Trying to face-time?
10       A.   Yes.
11       Q.   And he tells you to give him that other arm and
12   give him the phone and you don't do that?
13       A.   I refused because I wanted somebody to witness
14   what was going on.
15       Q.   How many times did he tell you that?
16       A.   I'm not sure.  I don't recall.
17       Q.   Okay.
18       A.   But he did say give him the phone.
19       Q.   Okay.
20       A.   And give him my other arm.
21       Q.   And so when you didn't do that, that's when he
22   took the phone?
23       A.   Uh-uh. (Nods head up and down.)
24       Q.   Yes?
25       A.   Yes.

George Welch -- May 24, 2021

Page 93

1      Q.  Okay.  And he --

2      A.  He threw the phone down the driveway.

3      Q.  Threw the phone down the driveway.  Okay.  At

4  what point did he tase you?  Did you have your phone in

5  your hand when he tased you?

6      A.  I had the phone in my hand when he tased me.

7      Q.  And your understanding, how many times did he

8  tase you?

9      A.  It felt like three.

10     Q.  Okay.  Have you seen the Taser log that was

11  produced in this case?

12     A.  Yes.

13     Q.  Okay.  And would you agree with me that that

14  indicates that the trigger was pushed twice?

15     A.  But the -- I understand that the trigger was

16  pushed twice.  You can hold the trigger and  -- you can

17  look at the gun -- at the picture.  I got three marks on

18  my back, three different places.

19     Q.  Okay.  So you don't dispute that the Taser was

20  pulled twice?

21     A.  No, I don't dispute that, no.

22     Q.  Had you ever been tased before that?

23     A.  No.

24     Q.  Okay.  Do you know the difference between being

25  tased with like the actual prongs of a Taser and the

George Welch -- May 24, 2021

Page 95

1    A.  And then he grabbed my arm while he was tasing

2    me, put his knee on my back, and I'm thinking -- I don't

3    know how he did it, but this arm was behind my back.  He

4    had it --

5    Q.  Your left arm?

6    A.  Yeah.  My left arm was behind my back, and he

7    was grabbing this.  And all of that stuff happened

8    after he tased me.  He got my arm after he tased me.

9    Q.  And then he put you in cuffs?

10   A.  Yes.

11   Q.  And then who was the first officer to arrive on

12   the scene after you were in cuffs?

13   A.  I'm not sure.

14   Q.  Okay.  And you said all the other officers that

15   eventually arrived, they all came after you were already

16   in cuffs?

17   A.  Uh-huh.

18   Q.  Yes?

19   A.  Yes.

20   Q.  Were you still on the ground when any of the

21   officers came?

22   A.  Yes, I was, because it took two officers to

23   pick me up.  They picked me up by my arm.

24   Q.  Do you know which officers picked you up?

25   A.  I know Harris was one.

George Welch -- May 24, 2021

Page 96

1    Q.  Okay.  And another officer assisted him in
2  picking you up?
3    A.  Yes.
4    Q.  Where did they take you after they picked you
5  up?
6    A.  To the police car, Harris' police unit.
7    Q.  And did you stand on the outside, or did they
8  put you in it?
9    A.  They put me in it.
10   Q.  And you're still handcuffed?
11   A.  Yes.
12   Q.  And they put you in the back of the patrol car,
13  right?
14   A.  Yes.
15   Q.  Did you have any other conversations with any
16  of the other officers or --
17   A.  I talked with the Lieutenant.  He came to the
18  back of the patrol car and asked me a few questions.
19  And he said he needed to talk to the officers.  They
20  went and talked to Officer Harris.
21   Q.  What did he ask you when you were in the back
22  of the patrol car?
23   A.  Well, we knew each other from working out at
24  the jail.  And he said, let me handle this, and -- I
25  mean, Officer Scott, Lieutenant Scott, we worked out --

George Welch -- May 24, 2021

Page 101

1    You know, I don't want -- I don't want to be here.  I

2    don't believe in suing.

3         Q.  Uh-huh.

4         A.  I was done wrong.

5         Q.  Uh-huh.

6         A.  That's the only reason I am here.  If I wasn't

7    been done wrong, I would have paid the fines and kept

8    moving.

9         Q.  Did you do anything with the note?  Did you

10   give that to anybody or say anything to anybody?

11        A.  No.  Because I hadn't planned on doing this.

12        Q.  So Officer -- did Officer Harris drive you to

13   the police station?

14        A.  Yes, he did.

15        Q.  And were you booked in at the police station?

16        A.  Yes, I was.

17        Q.  Okay.  And were you bonded out at some point?

18        A.  Yes.

19        Q.  Who bonded you out?

20        A.  My daughter.

21        Q.  Okay.  How long were you there before she

22   bonded you out?

23        A.  About three hours.  Lieutenant Scott had called

24   the judge, and they had set bond before I even left the

25   house.

George Welch -- May 24, 2021

Page 102

1      Q.  Do you remember how much it was?

2      A.  $1,500.

3      Q.  Did you pay a cash bond, or did you get --

4      A.  Cash bond.

5      Q.  What did you do -- where were you at for those

6   three hours when you were at the jail?

7      A.  At the jail I was locked up.

8      Q.  They put you in a holding cell?

9      A.  I guess.

10     Q.  Was anybody else in there with you or were you

11  by yourself?

12     A.  By myself.

13     Q.  So your daughter came up there and bonded you

14  out?

15     A.  Uh-huh.

16     Q.  Yes?

17     A.  Yes.

18     Q.  Where was she living?

19     A.  She just happened to be home that weekend.  She

20  lives in St. Louis.

21     Q.  Where was she staying at while she was here?

22  Not with you?

23     A.  With her mother.

24     Q.  Okay.  Okay.  And then after you bonded out,

25  how long was it until you retained counsel for the

George Welch -- May 24, 2021

Page 104

1      Q.  Did you have to get any kind of medical

2  treatment after this incident?

3      A.  I didn't go.  I should have went because to

4  this day I'm still numb from the handcuffs right this

5  little section of my arm.  It's like a nerve is dead.  I

6  had Officer Harris to actually loosen the handcuffs up

7  because it had this whole thumb swollen for about two

8  days and I couldn't move it.

9      Q.  At some point you told Officer Harris the

10  handcuffs were too tight, right?

11      A.  Right.  And he loosened them.

12      Q.  And he loosened them.  Were you still at your

13  house?

14      A.  We were at the courthouse.  It was where he was

15  booking me at the courthouse.

16      Q.  Okay.  Did the -- did the Taser cause you any

17  injuries?

18      A.  It did, the burns on my back, yeah.

19      Q.  So there were burn marks on your back?

20      A.  Yes.

21      Q.  Okay.  Any other injuries other than the burn

22  marks on your back?

23      A.  The scars on my elbow from when I got tripped.

24      Q.  I'm talking about the Taser right now.

25      A.  No.

George Welch -- May 24, 2021

Page 105

1    Q.  So any other injuries from the Taser other than
2  burn marks on your back?

3    A.  No.

4    Q.  And how long did the burn marks stay there
5  before they went away?

6    A.  I'm not really sure.  It's something you don't
7  want to look at every day.

8    Q.  Well, I mean, do you know if it was weeks,
9  months, years?

10   A.  It didn't last years.  It was some weeks, I
11  know.

12   Q.  So a few weeks?

13   A.  Yeah.

14   Q.  What -- what other injuries did you have?  You
15  mentioned something on your elbows?

16   A.  Elbows, yeah.  Because when he tripped me, I
17  fell on my elbows on that asphalt, concrete, whatever
18  you want to call it.

19   Q.  And what kind of injury did you suffer to your
20  elbows?

21   A.  Scrapes.

22   Q.  On both of them or one, in particular?

23   A.  The left one, in particular.

24   Q.  Okay.  And how long did those scrapes last?

25   A.  Weeks.

George Welch -- May 24, 2021

Page 106

1      Q.  A couple weeks?

2      A.  Yes.  At least that long.  I don't heal quick

3  because I'm diabetic.

4      Q.  And then any other injuries?  You mentioned

5  your hand.

6      A.  Yeah, my hand, the numbness in my hand.  And

7  then I have another picture -- the handcuffs cut this

8  wrist, but we got pictures of those.  You should have

9  those.

10     Q.  Okay.  And we are going to look at the pictures

11  here in a second.  Okay?

12              Any other injuries besides those, elbows,

13  the marks from the Taser, and the hands?

14     A.  Those were the only physical injuries.

15     Q.  Only physical injuries.  Okay.  Have you ever

16  been diagnosed with anything related to your hand?

17     A.  No.

18     Q.  Okay.  Have you ever been to the doctor for it

19  at all?

20     A.  No.  I'm just working with my hands being a

21  mechanic, you know, but --

22     Q.  Have you seen -- have you sought any medical

23  treatment related to this incident at all?

24     A.  No.

25     Q.  Okay.

George Welch -- May 24, 2021

Page 107

1      A.   At the time I didn't have an insurance plan.

2      Q.   Okay.  Do you have insurance now?

3      A.   Yes.

4      Q.   When did you get insurance?

5      A.   Last year about this time, about January of

6   last year.

7      Q.   January of 2020?

8      A.   2020, yeah.

9      Q.   Okay.

10      A.   That's the blessing of being in your own

11   business.

12      Q.   I'm sure it's not cheap, is it?

13      A.   No.  It's a real nice car payment.

14      Q.   Do you know how much money you spent on legal

15   fees related to your criminal case?

16           MR. PERRY:  Object to the form.

17           You can answer.

18      A.   Not offhand, but all the -- the legal forms --

19   you're talking about paying my lawyers?

20      Q.   Uh-huh.

21      A.   That's continuous.

22      Q.   Okay.  Well, I'm talking about just the

23   criminal proceedings right now.  Did you -- did you --

24   have you actually paid any money on that criminal case?

25      A.   Yes.

REPORTING BY DANA, LLC
(601)-506-3440

George Welch -- May 24, 2021

Page 109

1    civil case is contingency?  Is that right?

2              MR. PERRY:  Sure.  It's a contingency.  The

3    normal fee would be ten grand.  I took it because of

4    what happened to him.

5         Q.  When you told me five grand, Mr. Welch, I was

6    about to tell you you got yourself a deal, but I

7    probably don't need to tell you that.

8              Do you -- all right.  Are you contending

9    you lost any wages or income because of this incident?

10        A.  Oh, yes.

11        Q.  Okay.  Tell me about that.  What income have

12   you lost because of the incident with Officer Harris?

13        A.  The Busted magazine they put me in.

14        Q.  Tell me about that.

15        A.  The day I delivered that Mercedes to

16   Mercedes Benz of Collierville, I don't know the porter's

17   name, Dee.  They call him Dee.  Did you know you're in

18   Busted?  What you do.  What you do?

19              He handed it to the managers and they cut

20   my contract completely off.

21        Q.  After that?

22        A.  Yes.

23        Q.  Okay.

24        A.  That right there is -- the last car that's on

25   this trailer is the last car delivered to Mercedes Benz

George Welch -- May 24, 2021

Page 110

1    of Collierville.

2         Q.  Let me explore that a little bit.  You

3    mentioned something called Just Busted.  It's one of

4    these --

5         A.  Magazines you get in that in the show with

6    their picture in it.

7         Q.  Okay.  And you showed up in that magazine

8    because of the arrest, right?

9         A.  Yes.

10        Q.  And did you know you were in there before you

11   dropped that car off?

12        A.  No.  I had no idea.  I didn't know anything

13   about Just Busted.

14        Q.  Okay.  So on December 23rd, after you -- you

15   bonded out on December 23rd later on that day, right?

16        A.  Uh-huh.  (Nods head up and down.)

17        Q.  Yes?

18        A.  Yes.

19        Q.  And did you -- when did you take that car that

20   was -- that Mercedes, that was --

21        A.  That Christmas Eve, that Monday.

22        Q.  And so when you took it that Monday, somebody

23   -- you took it to the Mercedes dealership, right?

24        A.  (Nods head up and down.)

25        Q.  And somebody at the dealership presented you

George Welch -- May 24, 2021

Page 111

1    with that Just Busted magazine, right?

2        A.  Well, yes, they did.  But this wasn't the car I

3    took there.  I picked up another car in Atlanta later on

4    that week when they pulled that Just Busted.

5        Q.  Okay.

6        A.  This car here was going to a person.

7        Q.  I got you.

8        A.  And I picked up another car in Atlanta for

9    Mercedes Benz of Collierville.  This one here was a

10   personal car for Mercedes of Collierville.  I got that

11   mixed up.

12       Q.  So the day of the incident, the car that you

13   had on that trailer, that was for a person?

14       A.  That was a person, for Mercedes of

15   Collierville.

16       Q.  When did you deliver that car?

17       A.  I delivered it that Monday.

18       Q.  Okay.  So the 24th?

19       A.  Yes.

20       Q.  Okay.  And so later on in the week, you

21   delivered another car?

22       A.  Picked up another car in Atlanta and brought it

23   back to Memphis to that Mercedes Benz of Collierville,

24   and that's when --

25       Q.  Who showed you that Just Busted magazine?

George Welch -- May 24, 2021

Page 112

1      A.  The guy's name is Dee.  He works there and he

2  showed it to the manager, and they made fun of it,

3  laughed about it and all this stuff, but later on, I

4  found out that's why I couldn't haul cars for them no

5  more.

6      Q.  Let me ask you this.  Who was the manager at

7  the time?

8      A.  Harold Williams.

9      Q.  Harold Williamson?

10     A.  Harold Williams.  I think it's Williams.

11     Q.  All right.  And somebody named Dee that worked

12  there?

13     A.  He is a porter.

14     Q.  He is what, now?

15     A.  He's the porter.

16     Q.  Porter?

17     A.  Yeah.

18     Q.  What do they do?

19     A.  Just miscellaneous.  Shuttle cars, things like

20  that.

21     Q.  And so while you were physically there that

22  day, he showed that Just Busted magazine --

23     A.  Said, "Geo, what you doing in there?"  They

24  making fun and laughing about it and all this crap.

25     Q.  And you said that's the last car that you ever

George Welch -- May 24, 2021

Page 113

1   hauled for them, right?

2        A.  Yeah.

3        Q.  Who told you that it had anything to do with

4   your arrest?

5        A.  Well, I was wondering why I wasn't getting it

6   and I called.  I said, why am I not getting, you know --

7   and he said, well, just because of the criminal --

8        Q.  Who told you that?

9        A.  The manager.

10       Q.  Harold Williams?

11       A.  Yeah.

12       Q.  Is he still the manager there?

13       A.  I think so.  I think so.

14       Q.  Do you know where he lives at?

15       A.  No.  I have not a clue.

16       Q.  And he told you that on the phone?

17       A.  I mean, I hauled cars out of there, but it's

18  for different brokers.  And I just said, did y'all stop

19  selling cars, and after hauling for big companies for

20  somebody that buys a car from Mercedes, another dealer

21  out of Atlanta, buying a car from Mercedes, and I'm

22  brokering it through Atlanta, but I'm picking it up in

23  Collierville, and I was in there, and I said, why y'all

24  stop using me?  And that was the reason.

25       Q.  Did you have a contract with them at the time?

George Welch -- May 24, 2021

Page 114

1      A.  No.  Pretty much a verbal contract.  I moved

2  everything they had, what we call onesies and twosies,

3  from Atlanta back to Memphis.

4      Q.  But you didn't have a written contract?

5      A.  No.

6      Q.  It was oral?

7      A.  But specifically they stopped using me because

8  I was in that magazine.

9      Q.  Well, was there any kind of finite amount of

10  money that you made from that dealership prior to then

11  or would it just depend on what was going on?

12      A.  It would kind of depend on what was going on,

13  but I moved anywhere from three to six cars every week.

14      Q.  And how much do you get for every haul?

15      A.  Just depend on where I was going.

16      Q.  Okay.  Well, I guess what I'm saying is is

17  there any way to quantify how much money you think you

18  lost because they quit using you?

19      A.  Not really, because I probably -- when I -- you

20  know, I was getting bigger and bigger.  And that's the

21  way it's been going.  Everything was bigger and bigger,

22  more and more, especially with these cars.

23      Q.  You're talking about even to present?

24      A.  Yes.

25      Q.  So you're making more money now than you were

CERTIFICATE OF COURT REPORTER

I, KAREN CARNELL POPERNIK, MS CCR 1276, TN LCR 469, Notary Public commissioned by the State of Mississippi, do hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, GEORGE WELCH, as taken by me at the time and place heretofore stated, and later reduced to typewritten form to the best of my skill and ability; that I placed the witness under oath to truthfully answer all questions in this matter by the authority vested in me by the State of Mississippi and the State of Tennessee; that the signature of the witness was expressly not waived; and that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceeding.

Witness my signature and seal on this the 10th day of June, 2021.

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 10156
KAREN CARNELL POPERNIK
Commission Expires
March 5, 2024
LAFAYETTE COUNTY

KAREN CARNELL POPERNIK,
MS CCR 1276, TN LCR 469 (Exp. 7/1/22)
My Commission Expires: 3/5/24