BEFORE THE COUNTY COURT OF DESOTO COUNTY, MISSISSIPPI
_____

STATE OF MISSISSIPPI, CITY OF HERNANDO ,         PLAINTIFF

VS.                                   CAUSE NO.: S2020-0005

GEORGE WALKER WELCH,                             DEFENDANT
_____

TRANSCRIPT OF PROCEEDINGS HAD AND DONE IN THE BENCH TRIAL

OF THE ABOVE STYLED AND NUMBERED CAUSE, BEFORE THE

HONORABLE ALLEN B. COUCH, JR., COUNTY COURT JUDGE, AT

APPROXIMATELY 1:15 P.M. ON THE 28TH DAY OF SEPTEMBER,

2020.

_____


APPEARANCES:

   REPRESENTING THE PLAINTIFF:

   HONORABLE ELIZABETH PAIGE WILLIAMS, ESQ.
   Williams & Williams
   217 West Center Street
   Hernando, Mississippi 38632
   662-449-4305


   REPRESENTING THE DEFENDANT:

   HONORABLE JOHN KEITH PERRY, JR., ESQ.
   Perry Griffin, PC
   5699 Getwell Road, Building G5
   Southaven, Mississippi 38672
   662-536-6868



MICHELLE A. BROWN, CCR #1395
DeSoto County Official Court Reporter
2535 Highway 51 South, Hernando, MS 38632
michellebrown.csr@gmail.com

```
 1      Q    Eight years with the City of Hernando or in law
 2   enforcement in all?
 3      A    City of Hernando.
 4      Q    Was that your first and only law enforcement
 5   job?
 6      A    Yes.
 7      Q    Are you working in law enforcement right now?
 8      A    No.
 9      Q    All right.  And in those years, you don't
10   remember making an arrest based off of a parking
11   violation?
12      A    No, I don't.
13      Q    Mr. Welch's vehicle was parked in front of the
14   house, right?
15      A    Yes.
16      Q    Other than being parked in front of the house,
17   you didn't see him driving it, did you?
18      A    No.
19      Q    You didn't see him doing anything other than
20   being in his home on a Sunday morning, right?
21      A    Correct.
22      Q    You said he came to the door and met you at the
23   front door, right?
24      A    Yes.
25      Q    And when he met you at the front door, he didn't
26   threaten you and tell you to get off of his grass or
27   anything like that, did, he, or get out of his yard?
28      A    No.
29      Q    In fact, he engaged and talked to you, right?
```

```
 1       A    Yes.
 2       Q    And he did -- according to your record, he said
 3   that his neighbors are fucking bitches for calling the
 4   police on him.  Is that arrestable?
 5       A    No.
 6       Q    He wasn't being loud, was he?
 7       A    Yes.
 8       Q    When you testified before, do you remember
 9   saying that he cussed?  It didn't sound like he got loud
10   with you, did it?
11       A    Repeat your question.
12       Q    When you testified previously, you didn't say he
13   got loud.  You said he seemed agitated before.  Now you're
14   saying that he was loud, correct?
15       A    I don't recall if you asked that question
16   previously.
17       Q    Oh, I asked it.  And I'm asking you now, though,
18   based off your memory and your recollection, was he load?
19       A    Yes, he was.
20       Q    Were there neighbors coming outside?
21       A    I don't recall if there were neighbors outside.
22       Q    Was he inciting people or anything like that
23   that you saw?
24       A    Inciting?
25       Q    Inciting.
26       A    I don't recall.
27       Q    He was in his own house Sunday morning, right?
28       A    Yes.
29       Q    And you said yourself that you could go around
```

```
 1  the vehicle, right?
 2       A    Unsafely, yes.
 3       Q    I didn't ask you about safely or unsafely.  I
 4  asked you about being able to go around the vehicle.  You
 5  said yourself that you could go into the lane and go
 6  around the vehicle, correct?
 7       A    Correct.
 8       Q    And had you ever made an arrest based off of
 9  having to go into another lane of a --
10            BY MS. WILLIAMS:  Your Honor, I'm going to
11            object to the relevance if he has ever made that
12            arrest before or not.
13            THE COURT:  He's asking a question, could
14            he go around the vehicle and has he ever made an
15            arrest because he couldn't go around a vehicle.
16            That's the question I understand.  I will allow
17            that.
18  MR. PERRY CONTINUING:
19       A    I don't recall if I ever have.
20       Q    You said that you worked with the City of
21  Hernando for a number of years?
22       A    Yes.
23       Q    I want to show you a serious of photographs,
24  okay.  These are from the city of Hernando.  I'm just
25  going to ask you if you've seen those -- you're familiar
26  with the streets.
27       A    You're going to ask me if I'm familiar with the
28  streets?
29       Q    I'm going to ask you if you're familiar with the
```

1   streets as a law enforcement officer in the City of
2   Hernando.
3             BY MR. PERRY:  May I approach?  I'm sorry.
4             THE COURT:  Yes.
5     A   Yes.
6     Q   You recognize that?
7     A   Yes.
8     Q   Where is that?
9     A   That's in front of the administrative building
10  on the Square.
11     Q   How far are we from that, approximately?
12     A   A few hundred feet.
13     Q   And you see a vehicle on a lane of traffic on
14  Caffey Street captured in this vehicle -- in this picture,
15  I'm sorry?
16     A   (Nods head.)
17     Q   That's Caffey and Losher.  Are you familiar with
18  that?
19     A   Yes.
20     Q   And do you see a vehicle captioned in this
21  particular photograph?
22     A   I do.
23     Q   And does it not appear that this vehicle was on
24  the right-hand shoulder of this street?
25     A   Yes.
26     Q   And if you're trying to go down that street, you
27  would have go over to the other lane and continue to go,
28  right?
29     A   Yes.

1      Q    And would you have arrested the gentleman that
2  would own this particular vehicle?
3      A    I can.
4      Q    Without engaging him?
5      A    Correct.
6      Q    But just walking to the scene and seeing it --
7  you say it's arrestable -- then you could arrest him
8  immediately, though, based off of your testimony
9  previously, correct?
10     A    Could.
11     Q    Have you ever made an arrest on somebody who --
12 when you've addressed them about that.
13          BY MS. WILLIAMS:  Your Honor, I object.
14          That's been asked and answered.
15     A    I can't recall.
16          BY MR. PERRY:  I'll move on.
17          THE COURT:  He said he doesn't know.
18          BY MR. PERRY:  Yes, Your Honor.
19          THE COURT:  So that's his answer.
20 MR. PERRY CONTINUING:
21     Q    All right.  You're familiar with Keenlan Drive?
22     A    Yes.
23     Q    Where is Keenlan Drive?
24     A    It would be in the same neighborhood as where
25 Carlee Drive is.  You've got a glare on the picture, so
26 I'm trying to see it.
27     Q    Okay.  And that's not too far from where you
28 arrested --
29          THE COURT:  Let him handle that, so he can

```
 1            adjust it to the light.
 2                 BY MR. PERRY:  Oh, okay.
 3                 THE COURT:  There is a glare.
 4                 BY MR. PERRY:  Yes, sir.
 5   MR. PERRY CONTINUING:
 6        Q    Where is that located?
 7        A    It's in the same neighborhood as Carlee.
 8        Q    Approximately how far from the house that you
 9   arrested Mr. Welch in?
10        A    Right around the corner.
11        Q    And would you say less than half a mile?
12        A    Yes.
13        Q    About a quarter of a mile at the most, right?
14        A    Yeah.
15        Q    And based off your testimony and based off the
16   parking of that vehicle, you can't go around -- you can't
17   drive directly behind that vehicle without going into the
18   other lane to get around it, correct?
19        A    That's correct.
20        Q    And based off your testimony earlier, that's an
21   arrestable offense, right?
22        A    That's correct.
23        Q    But you've never made that arrest that you can
24   remember?
25                 BY MS. WILLIAMS:  Objection, Your Honor,
26            asked and answered.
27                 THE COURT:  Mr. Perry, don't ask that
28            question again, okay.  You've made your point.
29                 BY MR. PERRY:  Yes, sir, I'll move on.
```

```
 1   MR. PERRY CONTINUING:
 2        Q    Was the car parked on the sidewalk?
 3        A    No.
 4        Q    Was it parked in front of a public or private
 5   driveway?
 6        A    No.
 7        Q    The truck I mean.  Now, I'm not -- when I say
 8   "car," I apologize, but the vehicle that we're talking
 9   about.
10        A    Correct.
11        Q    Within an intersection?
12        A    It was east of an intersection.
13        Q    But it wasn't within the intersection, was it?
14        A    No.
15        Q    And it wasn't within 10 feet of a fire hydrant?
16        A    I don't recall.
17        Q    It wasn't on a crosswalk?
18        A    No.
19        Q    It wasn't -- was it within feet of a crosswalk
20   at an intersection?
21        A    I don't recall how far the intersection was from
22   where it was parked at.
23        Q    Did you measure how far the right -- or the
24   right side tires were in relation to the curb?
25        A    No.
26        Q    You didn't do any kind of measurements at all?
27        A    No.
28        Q    Between a safety zone or an adjacent curb or
29   within 30 feet of points of a curb immediately opposite
```

```
 1   the ends of a safety zone?  Was it close to a safety zone?
 2        A    No.
 3        Q    Was it within 15 feet of the nearest rail or
 4   railroad crossing?
 5        A    No.
 6        Q    Was it within 20 feet of a driveway entrance to
 7   a fire station?
 8        A    No.
 9        Q    Was it alongside or opposite of a street
10   excavation or obstruction, such as, stopping, standing,
11   and parking would obstruct traffic?  In other words, were
12   there people out boring the street, like at&t or somebody,
13   digging the side of the road next to where that truck was
14   parked?
15        A    You're asking me if there was any construction
16   near where the truck was parked?
17        Q    Right.  Was there any kind of construction going
18   on where that --
19        A    I don't believe so.
20        Q    Was it alongside or opposite any street -- I
21   asked you that.  I'm sorry.
22             Was it on the roadway side of any vehicle stopped or
23   parked?  In other words, was there a vehicle parked on the
24   opposite side of this truck?
25        A    No.
26        Q    Was it at any place where official signs were
27   prohibiting a person from parking?
28        A    I don't recall.
29        Q    You don't remember whether or not there was a no
```

```
 1   parking sign out there?
 2        A    I do not.
 3        Q    When you made the -- you said previously that
 4   you were talking with Mr. Welch, right?
 5        A    Yes.
 6        Q    Mr. Welch was engaging in conversation with you.
 7   He said some cuss words, right?
 8        A    Yes.
 9        Q    At no point did he ever threaten you, did he?
10        A    No.
11        Q    At no point did he ever command you at all, did
12   he?
13        A    No.
14        Q    He didn't tell you to leave, stay or anything,
15   right?
16        A    No.
17        Q    Matter of fact, in your testimony previously and
18   I think today as well, when you told him he needed to move
19   the truck he was starting to move the truck, was he not?
20        A    He was walking towards the truck, yes.
21        Q    To move it, right?
22        A    Yes.
23        Q    And at that particular point in time based off
24   of what you said to him, he was doing what you asked of
25   him, correct?
26        A    Yes.  And I also asked for his ID at the same
27   time.
28        Q    And when you asked him for his ID, he told you
29   what?
```

1  the officer. So the question is did the officer
2  have grounds to make a lawful arrest, and that
3  means focusing on the charge of obstruction of
4  traffic. And when I look at the definition of
5  "obstruct," Merriam-Webster defines it as, "To
6  block up or close up by an obstacle; to hinder
7  from passage, action, or operation."
8      Blacks Law dictionary, our bible, defines
9  it as, "To block up, interpose obstacles or to
10 render impassable." And I've look at some of
11 the other surrounding circumstances in -- I
12 guess, in statutes or lack thereof. There has
13 been no testimony that it was illegal to
14 actually park on the street, no testimony that
15 there were no parking signs, or that there is
16 some statute or city ordinance that does not
17 allow parking on the street.
18     So it all, again, comes down to did this
19 fall under obstruction. Now, this is a two-lane
20 street, and we heard testimony from a resident
21 of the street that there are cars parked on this
22 street all the time. And because it's a
23 two-lane street, any time a car is parked on the
24 street, unless it pulls completely into the
25 yard, some portion of it is going to block the
26 roadway. And the photographs that were entered
27 into evidence in this case show that Mr. Welch's
28 vehicle blocked, you know, probably 80 percent
29 of one lane of traffic but did not go into the

1       opposing lane of traffic.
2              And so, again, I look at what is
3       "obstruct", and I think any definition of
4       "obstruct" means you can't move.  Whereas,
5       Black's says -- and this, to me, really jumped
6       off the page -- "to render impassable."  This
7       was not impassable.  The officers that were
8       there, were able to get around.  No one was
9       prohibited from getting around this vehicle.
10             Mr. Perry made reference to 63-3-901, which
11      is a list of places where stop and standing and
12      parking a vehicle is prohibited.  And, of
13      course, it didn't fall under any of those.  But
14      I think our operable statute here refers to
15      actually blocking traffic or obstructing it, and
16      I just don't think that this is -- meets the
17      definition of obstruction by any reasonable
18      reading of the statute or the definition of the
19      word "obstruct".  Cars were able to pass
20      through.  There's no prohibition against --
21      legal prohibition against him parking there.
22      Now, there may be homeowners rules or
23      restrictive covenants, but that's not a crime.
24             So we turn to the resisting arrest, and
25      it's well-established that an individual has the
26      right to use reasonable force to resist an
27      unlawful arrest.  The testimony of the defendant
28      was that the defendant refused to comply and put
29      his hands behind his back.  He didn't strike the

```
 1            officer or take any defensive action.  He just
 2            didn't let him cuff him.  And his level of force
 3            did not exceed that of the officers, and I think
 4            it would be reasonable under the circumstances.
 5                 So accordingly, I would find the defendant
 6            not guilty on both counts.  And, frankly, I'll
 7            say this, this is a situation where the
 8            homeowner's association is putting the police in
 9            a bad situation.  There's a -- if it was a
10            violation of restrictive covenants, there's
11            another remedy for this, and it's not by
12            involving law enforcement.
13                 But that is the order of the Court.  If
14            there was a bond, it's to be returned.  Should
15            that go directly to Mr. Welch?
16                 BY MR. PERRY:  Yes, Your Honor.
17                 THE COURT:  Make sure the clerk has his
18            address.
19                 BY MR. PERRY:  Yes, sir.
20                 THE COURT:  That's the order of the Court.
21            We're adjourned.
22
23                      PROCEEDINGS CONCLUDED
24
25
26
27
28
29
```

1       C E R T I F I C A T E

2   STATE OF MISSISSIPPI:

3   COUNTY OF TATE:

4   I, MICHELLE A. BROWN, Certified Court Reporter and
5   Notary Public for the State of Mississippi at Large,
    do hereby certify that I reported in machine shorthand
6   Pages 1-67 of the above-captioned proceedings.

7   I HEREBY CERTIFY that the foregoing pages contain a
    full, true and correct transcript of my said stenotype
8   notes and digital recording then and there taken.

9   I FURTHER CERTIFY that I am not an attorney or counsel
    of any of the parties, nor a relative or employee of any
10  of the parties, nor am I a relative or employee of any
    attorney or counsel connected with the action, nor am I
11  financially interested in the action.

12  I FURTHER CERTIFY that in order for this document to be
    authentic and genuine, it must bear my original
13  signature and my embossed notarial seal and that any
    reproduction in whole or in part of this document is not
14  allowed or condoned and that such reproductions should
    be deemed a forgery.
15
    THEREFORE, witness my hand and my official seal in the
16  State of Mississippi on February 8, 2021.

17

18                              *Michelle A Brown*
                            MICHELLE A. BROWN, CSR #1395
19                          Notary Public at Large

20  My Commission Expires:
    September 3, 2024
21

[Notary Seal: STATE OF MISSISSIPPI NOTARY PUBLIC, ID # 46747, MICHELLE A. BROWN, Commission Expires Sept. 3, 2024, TATE COUNTY]

DEF-00472