```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2

 3      GEORGE WELCH                                    PLAINTIFF

 4      V.                        CAUSE NO. 3:20-CV-122-NBB-JMV
 5      CITY OF HERNANDO, MISSISSIPPI,
        OFFICER JOSEPH HARRIS, OFFICER
 6      ROBERT SCOTT, OFFICER R. SWATZYNA,
        OFFICER A. LEWIS, IN THEIR OFFICIAL
 7      AND INDIVIDUAL CAPACITIES, AND JOHN
        AND JANE DOES 1-10                             DEFENDANTS
 8
 9
10
                    VIDEO DEPOSITION OF JOSEPH HARRIS
11
12      Taken at the instance of the Plaintiff on Tuesday, May 25,
        2021, at the Hernando Police Department, 2601 Elm Street,
13          Hernando, Mississippi, beginning at 10:05 a.m.
14
15
16                      (Appearances noted herein)
17
18
19
20
21
22
23
        REPORTED BY:  Courtney R. Taylor, CCR, TLC
24                    Alpha Reporting A Veritext Company
                      236 Adams Avenue
25                    Memphis, Tennessee 38103

                                                         Page 1
```

Exhibit "H"

```
 1         Q.   -- according to what you're saying he's
 2    saying?
 3              Now, he disputed the fact that he said
 4    "fucking bitches," but if we take it under -- you
 5    didn't arrest him for that, if that's what you --
 6    you recall, right?
 7         A.   That's correct.
 8         Q.   And you didn't arrest -- he didn't take a
 9    swing at you or anything?
10         A.   No.
11         Q.   He never threatened you, right?
12         A.   No.
13         Q.   He never -- you didn't see him in an
14    altercation, according to your testimony earlier,
15    right?
16         A.   Correct.
17         Q.   And, in fact, you don't even remember if
18    anybody was outside in that -- on that street?
19         A.   Correct.
20         Q.   You didn't think that that vehicle was
21    taken or that -- or -- or that the trailer was
22    stolen or anything like that, did you?
23         A.   No, because he said it was his.
24         Q.   All right.  But there was no reason, at
25    that point, for you to think -- to have any thought
```

Page 57

```
 1        A.   I don't recall.
 2        Q.   Now, this was a -- a scene that has been
 3   heavily litigated at this point -- or at least in
 4   two different occasions -- or two different settings
 5   and this setting as well.
 6             You're saying that you don't remember
 7   whether or not there was any sort of vehicle trying
 8   to get around that vehicle while you were on the
 9   scene?
10        A.   No.
11        Q.   You don't remember it?
12        A.   I don't.
13        Q.   Okay.  And -- but you're not -- you're
14   definitely not in a position of testifying that
15   there was a vehicle that couldn't get around it?
16        A.   That's correct.
17        Q.   All right.  And so you didn't see a traffic
18   jam or something like that, rig- --
19        A.   No.
20        Q.   -- -ht?
21             And you didn't hearing cars blowing their
22   horns up and down that street, right?
23        A.   No.
24        Q.   All right.  You said that he -- he -- he,
25   then, turned and -- well, at some point, he turned.
```

Page 62

```
 1         Q.   All right.  And do you -- have you gone
 2   back out there since that time?
 3         A.   No.
 4         Q.   All right.  And you hadn't done anything as
 5   a follow-up, a follow-up investigation at all,
 6   right?
 7         A.   No.
 8         Q.   All right.  So is it your understanding
 9   that you can enforce, as a police officer, homeowner
10   association rules?
11         A.   No.
12         Q.   And if you don't see a parking sign, you
13   don't see a parking -- you -- you -- you don't see
14   anything out there indicating that he's not parking,
15   right?
16              And your testimony -- is that correct?
17         A.   Correct.
18         Q.   All right.  And you don't see a vehicle in
19   the left lane of traffic; in other words, the -- he
20   doesn't have the trailer parked across both lanes of
21   traffic, correct?
22         A.   Correct.
23         Q.   In fact, there is clear ingress and egress
24   from the left side, if you're facing the same
25   direction that his truck was facing, in the opposite
```

Page 109

```
 1   lane of traffic, right?
 2        A.   Right.
 3        Q.   And -- and his car was not across any
 4   centerline or anything like that, was it?
 5        A.   No, it was on the crest of a hill.
 6        Q.   Right.
 7             But it was -- did you have anything
 8   indicating that there was a vehicle that might have
 9   had an accident, because of that truck or trailer at
10   all?
11        A.   I didn't.
12        Q.   Had you ever gone before the board of
13   alderman and asked them to do something about a
14   parking situation out there on that particular -- in
15   that particular area?
16        A.   No.
17        Q.   Did you have any conversation with any
18   other neighbor -- with any neighbors in that area?
19        A.   No.
20        Q.   Do you know Wayne Perkins?
21        A.   Not until the case.
22        Q.   Did you -- you -- you know -- which one
23   Wayne Perkins do you know?
24        A.   The dad.
25        Q.   Okay.  And you referred to them as dad
```

Page 110

```
 1         Q.  But he wasn't calling you out of your name
 2   or anything like that, right?
 3         A.  Right.
 4         Q.  But he's talking about his neighbors; he
 5   was mad at his neighbors or whatever it was, but
 6   whatever the curse words -- they weren't towards
 7   you, towards you in a way that's -- that is
 8   threatening and -- and -- and et cetera.
 9             And I asked you this previously as well,
10   when we were having the trials in city court and
11   county court, you've always been clear.  He never
12   threatened you, right?
13         A.  Right.
14         Q.  All right.  All right.  It says, "Offender
15   Welch told me that he did not have to listen or do a
16   damn thing that I told him to do.  I told Offender
17   Welch to give me his driver's license so that I
18   could run it and issue him a citation for
19   obstructing traffic," right?
20         A.  Right.
21         Q.  And then it says, "Offender Welch stated,
22   'I'm not giving you a damn thing.'"  And he started
23   to walk away from you.  Then it says -- and this is
24   your words -- "I told Offender Welch again to give
25   me his license as he walked away from me in his
```

```
 1   yard.  Offender Welch kept cursing and stating he
 2   did not have his license, that they were inside his
 3   home."
 4            And, at that point -- and I'm assuming he's
 5   walking towards on the way that you're indicating
 6   this.
 7            Is he not?
 8       A.  Walking towards where?
 9       Q.  Where -- which -- you tell me, where is he
10   walking towards?
11       A.  He was walking towards his house.
12       Q.  All right.  And his license was in his
13   house, correct?
14       A.  Yes.
15       Q.  And it says, "At this time, Offender Welch
16   was still cussing and waving his hand about,
17   becoming more hostile."
18            Now, when you say "becoming more hostile,"
19   he never used any threatening words to you, right?
20       A.  Right.
21       Q.  He never told you to get off of his
22   property or get the hell out of his yard, anything
23   like that?
24       A.  I don't recall.
25       Q.  Okay.  And he (sic) says, "I" -- it says,
```

Page 124

1       Q.   Did you ever provide the footage that you
2  would have had in your car of anything related to
3  this incident?
4       A.   The camera was unfunctionable.
5       Q.   Why was yours unfunctionable?
6       A.   It didn't work.
7       Q.   I mean -- I understand that, but was there
8  a reason, or did you ever report that it was
9  unfunctionable or --
10      A.   I did.
11      Q.   All right.  What did they -- what were --
12 what were you told regarding it?
13      A.   They were not going to invest any money
14 into it.
15      Q.   Okay.  Were there several vehicles that had
16 dysfunctioning cameras, or --
17      A.   Yes.
18      Q.   -- was yours pretty much --
19           Okay.  And it was something that you did
20 make the -- the City aware of?
21      A.   Yes.
22           MR. PERRY:  All right.  I don't have
23      anything further.
24           MR. BUTLER:  No questions.
25           THE VIDEOGRAPHER:  All right.

Page 135

```
 1                CERTIFICATE OF COURT REPORTER
 2             I, Courtney R. Taylor, Court Reporter and Notary
 3     Public in and for the County of Bolivar, State of
 4     Mississippi, do hereby certify that the foregoing 136
 5     pages, and including this page, contain a true and
 6     accurate transcription of the testimony of Joseph Harris,
 7     as taken by me in the aforementioned matter at the time
 8     and place heretofore stated by stenotype and later reduced
 9     to typewritten form under my supervision by means of
10     computer-aided transcription.
11             I further certify that under the authority
12     vested in me by the State of Mississippi that the witness
13     was placed under oath by me to truthfully answer all
14     questions in this matter.
15             I further certify that I am not in the employ of
16     or related to any counsel or party in this matter and have
17     no interest, monetary or otherwise, in the final outcome
18     of this proceeding.
19             Witness my signature and seal this the 9th day
20     of June, 2021.
21
                               COURTNEY R. TAYLOR, CCR #1668
22
23
24
25     My Commission Expires:  August 19, 2023
```

Page 138