```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2

 3    GEORGE WELCH                                    PLAINTIFF

 4    V.                     CAUSE NO. 3:20-CV-122-NBB-JMV

 5    CITY OF HERNANDO, MISSISSIPPI,
      OFFICER JOSEPH HARRIS, OFFICER
 6    ROBERT SCOTT, OFFICER R. SWATZYNA,
      OFFICER A. LEWIS, IN THEIR OFFICIAL
 7    AND INDIVIDUAL CAPACITIES, AND JOHN
      AND JANE DOES 1-10                              DEFENDANTS
 8

 9

10
                    VIDEO DEPOSITION OF ROBERT SCOTT
11

12    Taken at the instance of the Plaintiff on Tuesday, May 25,
      2021, at the Hernando Police Department, 2601 Elm Street,
13           Hernando, Mississippi, beginning at 4:13 p.m.

14

15
                        (Appearances noted herein)
16

17

18

19

20

21

22

23    REPORTED BY:   Courtney R. Taylor, CCR, TLC
                     Alpha Reporting A Veritext Company
24                   236 Adams Avenue
25                   Memphis, Tennessee 38103

                                                          Page 1
```

Exhibit "L"

```
 1        A.   Right.
 2        Q.   Was -- was there a lot of cars, or any cars
 3   that -- or anything about the traffic at Walmart
 4   parking -- parking lot that stuck out in your head?
 5        A.   No.
 6        Q.   All right.  And you went from the location
 7   at that time to the location -- I mean to 1777
 8   Trapper Lane?
 9        A.   Now, I don't recall the actual numerics of
10   the address, but --
11        Q.   You went to the site where --
12        A.   Right.
13        Q.   -- the officer had called from?
14        A.   Correct.
15        Q.   All right.  Were you the first officer to
16   arrive?
17        A.   I was the first additional, yes.
18        Q.   And when you arrived at the scene, tell me
19   what you observed as you're pulling up.
20        A.   Mr. Welch was already in handcuffs.  He was
21   on the ground, and Harris was there.  And I get up,
22   and I walk up.  And everything was pretty much over
23   when I got there.
24        Q.   How was he on the ground?  Was he on his
25   stomach?
```

Page 11

```
1          A.   Stomach.
2          Q.   All right.  Where, in relations to the
3     house, was he located?
4          A.   It was in the driveway.  I mean, the -- I
5     mean, the driveway, from my recollection, was
6     straight.  And I don't know -- I -- it'd -- it'd be
7     hard for me to remember exactly how many feet, but
8     in front of the front of door, but closer to --
9          Q.   Let me ask it this way:  Was he closer to
10    the street or closer to the -- to the house?
11         A.   Like if I was asked to measure it, like I
12    mean -- yeah, it was closer to the house.  It was
13    not by the street.
14         Q.   Okay.
15         A.   No.
16         Q.   And was he -- was he in the grass, or you
17    said he was on the driveway?
18         A.   The driveway.
19         Q.   All right.  You observe him there.
20              What do you do once you see him on the
21    ground?
22         A.   At that point, he was being taken to the
23    patrolman car.  I mean --
24         Q.   Did --
25         A.   -- it was a very, very short period of time
```

Page 12

1  that he was on the ground when I was there.  And
2  then he was escorted to a patrol car.
3      Q.  Do you remember any conversation that you
4  would have had with him during that time?
5      A.  I don't.
6      Q.  You -- you're not saying that you didn't
7  have a conversation; you're saying you don't
8  remember the conversation, or are you saying you
9  didn't have any conversation at all?
10     A.  I -- I couldn't tell you a conversation
11 from that long ago, if I had any.
12     Q.  All right.  He -- when you arrived and --
13 did you ask the officer what had occurred?
14     A.  The officer told me what had occurred.
15     Q.  What did he tell you?
16     A.  He told me that he asked Mr. Welch to move
17 the trailer, and he got irate.  He asked him to give
18 him his driver's license.  He refused to give him
19 his driver's license, and, at that point, he said,
20 he arrested him for failure to comply, for not
21 giving him his driver's license.
22     Q.  Did you ask any questions about where the
23 driver license was?
24     A.  I did not.
25     Q.  At the -- when you -- when you arrived, do

Page 13

```
 1   you know whether or not he had the license in his
 2   hand --
 3        A.   I --
 4        Q.   -- the -- the office?
 5        A.   Huh-uh.
 6        Q.   Do you know if he got the license off of
 7   his person at all?
 8        A.   I -- I don't recall ever seeing the license
 9   at all.
10        Q.   All right.  How did Mr. Welch look when you
11   observed him when you were walking up?
12        A.   He was -- I don't -- I don't know.  Reword
13   the question, because --
14        Q.   What did he look like?  I mean, did he look
15   like just like when you had seen him previously in
16   the gym or previously on the streets, or did he look
17   like --
18        A.   No, he was agitated.  He was agitated
19   and --
20        Q.   Was he yelling or cursing or anything when
21   you came up?
22        A.   No, I don't recall that.
23        Q.   Did you -- have you ever Drive Stun -- or
24   had to use your Drive Stun mechanism in (sic)
25   anybody?
```

Page 14

```
1          A.   Uh-huh.
2          Q.   And you said that he told you that he --
3    that he had asked the gentleman to move his trailer,
4    right?
5          A.   Uh-huh.
6          Q.   Now, you've got to say "yes" or "no."
7    We've got to --
8          A.   Yes.
9          Q.   Okay.
10         A.   Sorry.
11         Q.   And once he asked him to move his trailer,
12   do you remember whether or not Mr. Welch was
13   actually in the process of walking to the trailer to
14   move it?
15         A.   I -- I have no idea, because all that stuff
16   happened before I was on scene.  I can't testify to
17   something I didn't see.
18         Q.   Well, I -- I understand that.
19              But what I'm asking for the sake -- when
20   we're right here -- did -- would -- did you ask him
21   if he was complying with the order to move the
22   trailer?
23         A.   I didn't ask him any questions.
24         Q.   All right.  Now, you were the commanding
25   officer, right?
```

Page 16

```
 1        A.   Uh-huh.
 2        Q.   "Yes" or "no."
 3             And I -- I know --
 4        A.   Yes.
 5        Q.   -- and I --
 6        A.   Sorry.
 7        Q.   -- I -- I should gone -- just -- I'm
 8   trying -- I'm trying to move faster than I should.
 9   I should have gone into a speech about when I ask a
10   question --
11        A.   Yes.
12        Q.   -- during this, just for the sake of --
13   of --
14        A.   Sorry.
15        Q.   -- this --
16        A.   I'll -- I'll do better.
17        Q.   No, you're not -- you're not doing anything
18   wrong.  It's just you're not -- well, you're doing
19   that wrong, but it's not on purpose.  It's just
20   normal conversation you're having.
21             But for the sake of what we're doing down
22   the road, I want to make sure we have a clear
23   record.
24        A.   Got it.
25        Q.   You were his commanding officer?
```

Page 17

1  A. I was.
2  Q. And as his commanding officer, even though
3  you might not have seen what took place, based off
4  of the information conveyed, you -- didn't you --
5  you not have discretion to say, "Hey, this might not
6  be a good arrest, and I want to override what you're
7  wanting to do right now"?
8  Did you have --
9  A. No.
10  Q. -- that discretion --
11  Let me -- let me ask the question. I
12  understand that you might never have done that ever.
13  Did you have that discretion, though?
14  Do you have that authority, as the superior
15  officer, to overrule the discretion of the officer,
16  who might have cuffs on someone, who, in your
17  opinion, does not need handcuffs on them?
18  MR. BUTLER: Object to the form of the
19  question.
20  You can answer it, if you can.
21  A. I don't really know how to answer that
22  question.
23  Q. (By Mr. Perry) Well, I mean, he can't tell
24  you how, here. But you can try it your best, and,
25  if you can't, you say, "I just can't answer that

Page 18

```
 1   question."  And that's fine, and the videotape
 2   will -- will have it for trial.  But --
 3        A.   I just -- I just -- I've never -- I've
 4   never been in a situation, where I felt that way,
 5   that I needed to intervene.  So I -- could I --
 6   we're -- we're getting in some legal, murky waters
 7   at that point.
 8        Q.   Okay.  And what does that mean?
 9        A.   That means let everything work out in
10   court, like this is going to be.
11        Q.   All right.  On this scene, though, if you
12   see a -- a subordinate officer that is making
13   something -- and I'm not saying necessarily in this
14   case.  If you see a subordinate officer do something
15   that you disagree with, can you make the decision to
16   takeover a particular scene; yes or no?
17        A.   Yes.
18        Q.   And, although, you might not do it or have
19   ever done it, can you also make the decision, based
20   off information that you're given, to say, "Hey,
21   this is -- guy does not need to be arrested at this
22   time"; yes or no?
23        A.   Yes.
24        Q.   All right.  And, likewise, based off of
25   information that you receive, do you have the
```

Page 19

```
 1                CERTIFICATE OF COURT REPORTER
 2            I, Courtney R. Taylor, Court Reporter and Notary
 3   Public in and for the County of Bolivar, State of
 4   Mississippi, do hereby certify that the foregoing 20
 5   pages, and including this page, contain a true and
 6   accurate transcription of the testimony of Robert Scott,
 7   as taken by me in the aforementioned matter at the time
 8   and place heretofore stated by stenotype and later reduced
 9   to typewritten form under my supervision by means of
10   computer-aided transcription.
11            I further certify that under the authority
12   vested in me by the State of Mississippi that the witness
13   was placed under oath by me to truthfully answer all
14   questions in this matter.
15            I further certify that I am not in the employ of
16   or related to any counsel or party in this matter and have
17   no interest, monetary or otherwise, in the final outcome
18   of this proceeding.
19            Witness my signature and seal this the 9th day
20   of June, 2021.
21

22                        COURTNEY R. TAYLOR, CCR #1668
23

24

25   My Commission Expires:  August 19, 2023
```

Page 22